**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOHAMMED HAROON ALI,<br>*Petitioner-Appellant,*<br><br>v.<br><br>RODERICK Q. HICKMAN, Director<br>California Department of<br>Corrections,<br>*Respondent-Appellee.* | No. 07-16731<br><br>D.C. No.<br>CV-05-05243-PJH<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
December 12, 2008—San Francisco, California

Filed July 7, 2009
Amended October 23, 2009

Before: A. Wallace Tashima and Marsha S. Berzon,
Circuit Judges, and Robert J. Timlin,* District Judge.

Opinion by Judge Berzon

---

*The Honorable Robert J. Timlin, United States District Judge for the
Central District of California, sitting by designation.

**COUNSEL**

Albert Joel Kutchins, Berkeley, California, for the petitioner-appellant.

Michele Swanson, Office of the California Attorney General, San Francisco, California, for the respondent-appellee.

**ORDER**

The opinion filed on July 7, 2009, and published at 571 F.3d 902, is hereby amended as follows:

1.  Slip Op. 8263, line 36: Replace <"reasonable" and demonstrated that the peremptory challenges had not been motivated by the juror's race.> with <"reasonable.">

2.  Slip Op. 8264, line 14: Replace <agreed with the trial court's conclusion> with <concluded>

With these amendments, the panel has unanimously voted to deny the petition for panel rehearing. Judge Berzon has voted to deny the petition for rehearing en banc, and Judges Tashima and Timlin recommend denial.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc are DENIED.

No further petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

BERZON, Circuit Judge:

In 2001, a California state court jury convicted Petitioner-Appellant Mohammed Ali of the first-degree murder of his girlfriend, Tracey Biletnikoff. During jury selection, the prosecutor, Stephen Wagstaffe, peremptorily struck the only two African-American members of the jury pool. Ali maintains that these strikes were racially-motivated and therefore violated his rights under the Equal Protection Clause of the Fourteenth Amendment. *See Batson v. Kentucky*, 476 U.S. 79 (1986). We hold that a comparative juror analysis, in combi-

nation with other facts in the record, demonstrates that the prosecutor's purported race-neutral reasons for striking at least one of the jurors were pretexts for racial discrimination. We further hold that the California Court of Appeal's contrary conclusion was not only incorrect, but unreasonably so. Accordingly, we reverse the district court's denial of Ali's petition for writ of habeas corpus and grant the writ.[1]

## I. Background

## A. Jury Selection

On November 8, 1999, the State of California charged Mohammed Ali with the first-degree murder of his girlfriend, Tracey Biletnikoff. Ali entered a plea of not guilty, and stood trial.

During the jury selection process, the state prosecutor used two of his peremptory challenges to strike the only African-Americans in the jury pool, first striking M.C.[2] and then Darrell Jefferson. Ali's trial counsel challenged both these strikes in turn under *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978) (California's equivalent of *Batson*), requesting an evidentiary hearing on the issue of the prosecutor's motive. After the prosecutor struck Jefferson, the trial judge granted the request.

At the ensuing hearing the prosecutor provided the following explanation for his strike of M.C.:

> M.C. — yesterday, I exercised my challenge there for the following reasons: We had an out-of-the-presence-of-the-jurors discussion with her about pri-

---

[1]Ali also raised several ineffective assistance of counsel claims in his habeas petition. Because we grant Ali's petition based on his *Batson* challenge, we do not reach these additional claims.

[2]We refer to this juror by her initials in order to protect her privacy.

vate matters wherein she talked about family members and the discussion with those involving the molestation of one child by another child, the involvement in the system. The way she described that, she ultimately told the Court she thought that that would not play a role, would not affect her judgment. Her words were that she doesn't think it will affect her judgment in this case. She did not say it won't. She said she doesn't think on that. It did involve family members within the system. That was, level one, a concern that I had. I have exercised challenges to other jurors for that same reason.

No. 2, she was very emphatic that — about — to Mr. Morales, and then to me later, about her concerns about attorneys and the way they conducted themselves in the courtroom; that if it was anything less than professional and respectfully done that that would affect her.

THE COURT: Would that be an unreasonable expectation?

PROSECUTOR: It would not be an unreasonable expectation to say; that it would occur to say it would affect her judgment was unreasonable. That's why Mr. Morales initially dealing on this issue followed up with that with her to say there were times he might cross-examine witnesses in an aggressive fashion and do that, to find out whether that would affect her judgment of him on that. I then followed up with her in my questioning to inquire about the same things. I thought we would act respectfully, but did she think it would affect her. Her demeanor, and the way she responded to that made it very clear to me that something she would — I think all of us would like to have occur, I expect it will occur, but as Mr. Morales has properly pointed out to several

jurors, at times there could be an aggressive approach to the case; that sometimes there may not. That gave me cause for concern, more so, of course, is the prior involvement in the prior offense.

No. 3, Your Honor, the question was posed to her and it was posed by the defense about what she felt in terms of sitting in judgment of others. Her response to that was a pause, reflection, and then she said, yes, that could be a problem for her, sitting in judgment of others, because she was thinking of her Christian faith. Mr. Morales then explored that with her and went further into, Well, what we would be talking about here is judging facts and that type of a matter. She thought about it and said, Well, taking that into consideration, I believe that is something I could do without crossing my religious tenets. I thought there was hesitancy in what she said.

Obviously, it is my burden to get twelve jurors who could judge the case. I thought a combination of these factors gave me good reason to be concerned about her ability to fairly and impartially do it, and I exercised a peremptory challenge for that reason and for that reason alone.

The trial court then asked the prosecutor to provide his reasons for striking Darrell Jefferson, to which he responded:

I thought Mr. Jefferson was an excellent juror up until the questioning here, based on what he did — you recall he came in and engaged in some banter with the Court when he was talking about his hardship request; that he — I believe it was a hardship, not publicity, inquiry that was done in chambers. As the Court stated a few minutes ago, when you expressed it, there were two things that caused me to change my mind. One of them was in response to

Mr. Morales' question. That question had to do with there was something — where he talked about, we make decisions as we go along. It gave Mr. Morales some concern. It gave me some concern.

Mr. Morales explored it a bit further with him. Well, wait. You can't make the decision. He said, Well, we do it. That's how life works. I know — and he said, We may change them as we go along but we make decisions. I have a phenomenally great concern about the intellectualizing. I thought that would do — it would be an over-intellectualizing of the case.

I want jurors, what I think Mr. Morales was striving for with him, about keeping an open mind until the end and not making decisions. The Court arrived at a conclusion there that that may be a semantical difference or something else, and I respect that conclusion, when you told Mr. Morales [during Jefferson's voir dire] to move on, but it gave me cause for concern there.

But at that point I was still considering the peremptory challenge, became evident to me when in response to a question from me he gave what — and it's personal to me. I respect it may be. I thought he gave me, and I respectfully use these words, a smart-ass answer.

THE COURT: Which [response]?

PROSECUTOR: The one when I commented to him, Is there anything else that you could think of that would cause you not to be fair and impartial, a question I have asked probably of over 50 jurors, 40 jurors in this case and never received other than no or maybe some answer. His was, I haven't done any-

thing yet, immediately provoking a barrel of laughter throughout the courtroom. I was offended by that comment.

By those two things, combined with the fact that he had had some contact, although he said he could lay it aside, and I respect that possibility, with dealing with a public defender and hearing about those cases.

That combination of things caused me to change my mind. Race had nothing to do with either of these things.

Those are my reasons, Your Honor.

THE COURT: What was the reason again about the hardship that you assert, Mr. [prosecutor?]

. . .

PROSECUTOR: My comment was, when [Jefferson] came in and spoke with you in the hardship — I am relaying to the Court my thought process — and the banter he engaged in. I thought it was lighthearted. It was not the hardship itself that concerned me. I thought it was a lighthearted banter, but I thought it reflected — the word I'm looking for is not disrespectful, but I thought it reflected a casualness that was not typical of jurors.

Again, this is a very subjective item and in and of itself would never give cause, but what I noted was the banter he engaged in was very much at ease, and that is not what I'm looking for in a juror; however, again, I would never exercise a challenge on that alone. That is merely factors that go into it. I've

given you four factors I believe that went into that decision.

THE COURT: With all due respect, I thought I heard two, one having to do with his banter and, slash, casualness during the hardship discussion; and, two, the response to the question you had asked that elicited laughter in the courtroom and then the — make that three — the judgment back and forth and mindchanging.

What was the fourth one?

PROSECUTOR: Yes, I understand. The fourth one was the contact that he had had with cases where he had been — briefed may be too strong a word, but he had had a rundown from his brother, who was an appellate defender, on some case before the Supreme Court. Hearing about that, that gave me cause for concern.

After providing Ali with an opportunity to respond to these explanations, the trial court denied Ali's *Wheeler* motion. The court concluded that the prosecutor's proffered justifications were "reasonable". In reaching this conclusion, the trial court did not consider comparative evidence regarding the responses of M.C. and Darrell Jefferson and the responses of non-African American members of the jury pool during the jury selection process.

Following the denial of Ali's *Wheeler* motion, the case proceeded to trial. After three days of deliberations, the jury found Ali guilty of first-degree murder. He was sentenced to 55 years to life in state prison.

## B. California Appellate Proceedings

The California Court of Appeal affirmed Ali's conviction on direct appeal in an unpublished opinion. With respect to Ali's *Wheeler/Batson* claim, the appeals court concluded that "[t]he jury selection process was not marred by purposeful discrimination," holding that "substantial evidence support[ed] the trial court's finding that the peremptory challenges were exercised without a discriminatory purpose." Like the trial court, however, the California Court of Appeal did not engage in comparative juror analysis. At the time, California law did not permit a court to conduct comparative analysis for the first time on appeal. *See People v. Johnson*, 30 Cal. 4th 1302, 1325 (2003), *rev'd sub nom. Johnson v. California*, 545 U.S. 162 (2005).[3]

In a separate order, the California Court of Appeal denied Ali's state habeas corpus petition without further analysis. The California Supreme Court denied Ali's petition for review and, later, rejected his state habeas petition in a one-line disposition.

## C. Federal Habeas Proceedings

Ali thereupon filed a federal habeas petition. The district court, unlike the California courts, performed a comparative juror analysis during its evaluation of Ali's *Batson* claim. In doing so, the court found that such an analysis "called into question" two of the prosecutor's reasons for striking M.C. Nevertheless, the court concluded that:

> While the instant comparative juror analysis does reveal some minor faults in the prosecutor's reasoning, the court finds that these faults do not demon-

---

[3]California courts are now required to conduct a comparative juror analysis even if such an analysis was not performed by the trial court. *See People v. Lenix*, 44 Cal. 4th 602 (2008).

strate racial bias or pretext. The court further finds that the prosecution's race-neutral justifications were sufficiently credible, clear, and reasonably specific. It therefore concludes that based on the totality of relevant facts, Ali has not shown purposeful discrimination . . . .

Ali asks this Court to reverse that decision.

## II.    Legal Standards

### A.    The *Batson* Framework

[1] The Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on the basis of their race. *See Batson*, 476 U.S. at 89. We apply a now-familiar three-part test when evaluating a defendant's equal protection challenge to a prosecutor's use of peremptory strikes. *See id.* at 96-98; *see also Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc): First, the defendant must make a prima facie showing that a challenge was based on race. *See Kesser*, 465 F.3d at 359. If such a showing is made, the burden then shifts to the prosecutor to produce a "clear and reasonably specific" race-neutral explanation for challenging the potential juror. *See id.* Third and finally, the court must determine whether, despite the prosecutor's proffered justification, the defendant has nonetheless met his burden of showing "purposeful discrimination." *See id.* To make this last determination, the court evaluates the "totality of the relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *See id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). The consideration of "purposeful discrimination" at step three of the *Batson* inquiry is a factual one. *See Batson*, 476 U.S. at 98 n.21 ("[A] finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court.") (internal quotation marks and citations omitted); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Here, neither party challenges the trial court's conclusion that Ali established a prima facie case and that the prosecutor satisfied his step two burden by providing specific race-neutral explanations for his strikes of M.C. and Darrell Jefferson. The sole issue therefore is whether the California courts and the district court erred in concluding that Ali had failed to meet his ultimate burden of establishing that the prosecutor's challenges were motivated by purposeful racial discrimination.

## B.    The Standard of Review

### 1.    Review of the State Court's Decision

Section 2254(d)(2) of Title 28, United States Code governs our review of the state appellate court's finding that the prosecutor did not engage in purposeful discrimination. *See Kesser*, 465 F.3d at 358 & N.1.[4] Pursuant to § 2254(d)(2), we must defer to the California appellate court's conclusion that there was no discrimination unless that finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2).[5]

---

[4]Relying on our opinion in *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), we held in *Kesser* that § 2254(d)(2), rather than § 2254(e)(1), governs our review of a state court's factual determination of the presence or absence of discriminatory animus where our review is based entirely on information that was contained in the state court record. *See Kesser*, 465 F.3d at 358 n.1. In this case, as in *Kesser*, the relevant evidence is found in answers to juror questionnaires and a transcript of voir dire, both of which were before the California Court of Appeal. Section 2254(d)(2) therefore applies. We note, however, that, also as in *Kesser*, "the question of which AEDPA standard we apply [is] academic, because the record satisfies either standard." *See id.*

[5]For AEDPA purposes, we evaluate the state court's last reasoned decision as the basis for the state court's judgment. *See Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002). In this case, that decision was the California Court of Appeal's opinion affirming Ali's conviction on direct appeal.

### 2.    Review of the District Court's Decision

We review *de novo* a district court's denial of a habeas corpus petition. *See Juan H. v. Allen*, 408 F.3d 1262, 1269 n.7 (9th Cir. 2005). If the district court makes independent factual findings, we review those findings for clear error. *See id.* If the district court does not make independent factual findings, we simply review the state court's findings under § 2254(d)(2), as discussed above.

In this case, the district court reviewed the state court record *de novo* and, after conducting a comparative juror analysis, found that the prosecutor did not act with a racially discriminatory motive when he peremptorily struck M.C. and Darrell Jefferson. Although the district court reviewed the state court record independently, its ultimate factual finding on the issue of the prosecutor's discriminatory intent was one that had already been made by the California Court of Appeal. Moreover, the district court's conclusion was based entirely on information that had been before the California appellate court. As a result, the district court did not make any factual findings that were independent of those made by the state appellate court. As both we and the district court are therefore obliged to review the California Court of Appeal's decision under the reasonableness standard provided in § 2254(d), we review the district court's *Batson* analysis *de novo*.[6]

## III.    Discussion

### A.    The Prosecutor's Challenge of Juror M.C.

The prosecutor provided three reasons for his decision to strike M.C. First, he stated that he was concerned that M.C.'s

---

[6]For the reasons discussed below, the district court's finding that the prosecutor did not act with a discriminatory motive when he struck M.C. was clearly erroneous. Therefore, even if we considered that finding to be an independent one, we would not uphold it.

judgment and objectivity as a juror might be adversely affected by the fact that her daughter had been the victim of an attempted molestation by the daughter's half-brother. Second, he said that he excused M.C. because she had indicated that "anything less than professional and respectful[ ]" conduct on the part of the attorneys might affect her view of the case. He explained that although it was reasonable for her to expect the attorneys to act professionally, he was concerned that she would react negatively to aggressive cross-examination. Finally, the prosecutor asserted that he struck M.C. because she had said that she might have trouble "sitting in judgment of others" due to "her Christian faith."

Without evaluating each of these justifications individually or performing comparative juror analysis, the California Court of Appeal concluded that "substantial evidence support[s] the trial court's finding that the peremptory challenge[ ] [of M.C. was] exercised without discriminatory purpose." The district court, however, did evaluate each of the proffered justifications one at a time and conducted comparative juror analysis. It found that such an analysis largely, although not entirely, undermined the prosecutor's first justification and wholly failed to support the second. At the same time, the court concluded that a comparative analysis buttressed the prosecutor's third explanation and that, "on balance," Ali had not shown that the prosecutor's removal of M.C. was motivated by "purposeful discrimination."

Our own review of the record convinces us that each of the prosecutor's justifications is logically implausible, undermined by a comparative juror analysis, and otherwise unsupported by the record. As we held in *Kesser*, where "an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's non-racial grounds," we are "compell[ed] [to conclude] that his actual and only reason for striking [the relevant juror] was her race." *Kesser*, 465 F.3d at 360. Such a conclusion is compelled in this case. The California Court of Appeal's contrary

finding was not only incorrect, but an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

### 1.    Reason 1: The Attempted Molestation of M.C.'s Daughter

On her juror questionnaire, M.C. indicated that she had had contact with law enforcement "when [there] was an attempt of molestation of my daughter." M.C. then discussed this response during private voir dire. The discussion transpired as follows:

> COURT: [On your questionnaire, you wrote] private, "When there was an attempt of molestation of my daughter." That's the area you would like to explore privately, right?
>
> M.C.: Uh-huh.
>
> COURT: How old was your daughter?
>
> M.C.: My daughter was 14.
>
> COURT: How old is she now?
>
> M.C.: She is 22.
>
> COURT: This is about eight years ago?
>
> M.C.: Yes.
>
> COURT: Who was the supposed molester?
>
> M.C.: Her brother.
>
> COURT: Was he living at home with you as well?

M.C.: No. It's a child by another lady that was visiting in our home. Because he had been having problems with where he lived with his mom, and he was staying with us.

COURT: Was your significant other or your husband the father of this boy?

M.C.: Yes.

COURT: I'm sorry?

M.C.: Yes.

COURT: So he was at some other home having problems there, and I take it that you agreed and your husband wanted to help him out by having him live with you?

M.C.: Yes.

COURT: How long was he in the home before this happened?

M.C.: I would say about three months.

COURT: Was it reported to the authorities?

M.C.: Yes.

COURT: In this county or elsewhere?

M.C.: In this county.

COURT: What happened? By the way, how old was he when this happened?

M.C.: He was about 17 years old.

COURT: So what happened?

M.C.: There was an incident, my daughter came to our room and reported it to us, and I called the police department, and the police came and they arrested the young man and took him to Juvenile Hall. Because he resided, his home residence was in Santa Clara County, they took him from San Mateo County to Santa Clara County, and he was in Juvenile Hall until we had — I call it a trial, court, whatever. And we went to court, and then they put him on a probation where he couldn't be in contact with her for, you know, x number of years.

COURT: Did your daughter testify in that court hearing?

M.C.: Yes. In a private chamber.

COURT: Is that the only incident that you were asking to have us discuss privately?

M.C.: Yes.

COURT: That's the only time that that molestation occurred was that one incident?

M.C.: Yes.

COURT: How do you think that incident and all of its ramifications, going to court and all of that, might influence you in this case?

M.C.: I really don't think — I don't think it would have any bearing. I don't know. I don't think it would. My daughter is 22 years old. She didn't have to have — we all had to do family counseling.

COURT: Did family counseling help her deal with the molestation?

M.C.: Yes. I know that it does still affect her even though she is 22 years old, and we have discussed it recently, before I was called to jury duty. It still has an effect on her. However, I didn't want it to be discussed in open court —

COURT: Don't worry about it.

M.C.: — in open session, so I thought I would put it out there.

COURT: You don't have to apologize for putting "private" on there. That's why we have these processes. Was it the East Palo Alto Police Department or was it the sheriff's office that did the investigation?

M.C.: I believe it was the sheriff's department.

COURT: Do you remember who the investigating officer was?

M.C.: No.

COURT: Anything about their the law enforcement angle, the local police department, whether it was the police or the sheriff, did you feel that they treated you with respect and your daughter with respect as a result of all of this?

M.C.: Yes.

COURT: Did you think it was a fair process that you had to go through and your daughter had to go through?

M.C.: Yes.

COURT: Would there be any lasting effect on either the defense or the prosecution in this case as a result of your experiences or knowledge about that?

M.C.: No.

COURT: Mr. Morales, any questions?

DEFENSE: No questions.

COURT: Mr. [Prosecutor]?

PROSECUTION: No.

According to the prosecutor, this exchange provided the first race-neutral reason for his dismissal of M.C. He described that reason as follows:

> M.C. — yesterday, I exercised my challenge there for the following reasons: We had an out-of-the-presence-of-the-jurors discussion with her about private matters wherein she talked about family members and the discussion with those involving the molestation of one child by another child, the involvement in the system. The way she described that, she ultimately told the Court she thought that that would not play a role, would not affect her judgment. Her words were that she doesn't think it will affect her judgment in this case. She did not say it won't. She said she doesn't think on that. It did involve family members within the system. That was, level one, a concern that I had. I have exercised challenges to other jurors for that same reason.

The district court perceived this explanation as revealing not one, but two concerns that the prosecutor had with M.C.

as a juror. The prosecutor's first concern, according to the district court, was that M.C.'s equivocal initial response to the trial court's question about how the child molestation incident might influence her ability to sit as a juror in Ali's case indicated that she might not be able to judge the case objectively. The district court described the prosecutor's second qualm as a "concern with [M.C.'s] involvement in the criminal justice system . . . ."

In evaluating these two expressed bases for striking M.C., the district court concluded that a comparative juror analysis undermined the prosecutor's first purported concern but supported the second, because "the prosecutor's concern with a potential juror's, including M.C.'s, involvement in the system was legitimate and consistently applied without apparent discriminatory purpose."

As explained below, we agree with the district court's conclusion that a comparative juror analysis, as well as other evidence in the record, thoroughly undermines the prosecutor's alleged first concern with M.C.'s objectivity. We disagree, however, with the court's determination that the prosecutor was legitimately troubled by M.C.'s "involvement in the system." As to the second concern, contrary to the district court's assertion, a comparative juror analysis reveals that the prosecutor did not "consistently" strike jurors who had experience with the criminal justice system. In fact, he accepted at least two white jurors who had more problematic experiences than M.C. Thus, even if we assume, like the district court, that the prosecutor's first explanation for his strike of M.C. conveyed two distinct concerns, a review of the record, including comparative juror analysis, compels the conclusion that both the alleged justifications were pretextual make-weights.

### 1.a.    M.C.'s Objectivity

[2] The prosecutor's assertion that he excused M.C. because she initially hesitated when responding to the court's

inquiry about the effect of the molestation incident on her ability to judge Ali's case is wholly unpersuasive, for several reasons.

**[3]** First, to the extent that the attempted molestation of her daughter might affect M.C.'s impartiality, any bias on M.C.'s part logically would favor the prosecution, not the defense. To be believable, a prosecutor's "[r]easons must be 'related to the particular case to be tried.' " *Kesser*, 465 F.3d at 359 (quoting *Batson*, 476 U.S. at 98). In this case, the victim, Tracey Biletnikoff, was, like M.C.'s daughter, a young woman and the victim of a domestic assault.

Moreover, M.C.'s description of the molestation focused entirely on the effect that the incident had on her daughter, with whom M.C. still lives. She stated, for example, that "I know that [the molestation incident] does still affect [my daughter] even though she is 22 years old, and we have discussed it recently, before I was called to jury duty. It still has an effect on her." When the trial court asked M.C. if the incident might influence her in evaluating Ali's case, M.C. again focused on her daughter, stating "I really don't think — I don't think it would have any bearing. I don't know. I don't think it would. *My daughter is 22 years old*. She didn't have to have — we all had to do family counseling." (emphasis added) If anything, then, M.C.'s experience and her description of that experience would suggest that she was more likely than the average juror to identify with the *victim* of the crime.

The State disagrees with this assessment of M.C.'s potential bias, arguing instead that the molestation incident reveals that M.C. may have "harbored some sympathy" for the perpetrator of the daughter's molestation, M.C.'s stepson. This view simply cannot be squared with the record.

Tellingly, M.C. never refers to the perpetrator as either her son or her stepson. Instead, she describes him alternately as "[my husband's] child by another lady," "the young man,"

and her daughter's "brother." In addition, M.C. stated that the stepson had only lived with the family for three months prior to the incident and was prohibited from contacting her daughter for several years afterwards. There is absolutely no indication that M.C. had any affection for, sense of family responsibility for, or ongoing relationship with the perpetrator.

The State nevertheless tenders the following "evidence" of M.C.'s alleged sympathy for the stepson: First, the State argues that "although her stepson received what could be perceived as a light sentence for a molestation that still affected her daughter eight years later, [M.C.] indicated that she thought the process had been fair." The State then suggests, absurdly, that "even though the molestation was apparently serious enough to merit police intervention and juvenile court proceedings, [M.C.] *appeared to minimize* the incident by referring to it as an 'attempt of molestation' in her juror questionnaire." Attempted sexual battery is a serious crime in California, *see People v. Dixon*, 75 Cal.App.4th 935, 942 (1999), and could certainly trigger law enforcement action. Nothing in the record indicates that there was actual, as opposed to attempted, molestation. The State's suggestion that M.C. "appeared to minimize" the incident, rather than to report it accurately, is therefore wholly without merit.

Two sentences later the State lurches further from the record when it writes, "Indeed, we note that the prosecutor seemed genuinely concerned about [M.C.'s potential sympathy for the defendant], and questioned [M.C.] about whether she might identify with Ali because she had a son in the same age range whom she might be able to picture in the same circumstances." It is true that the prosecutor asked M.C. about having a son the same age as Ali. And it is also true that M.C. expressed some concern over that fact. However, it is equally clear that M.C. was referring to her *biological* son, with whom she and her daughter live.

Contrary to the State's contention, then, there is no evidence in the record from which the prosecutor could have inferred that M.C. harbored sympathy for the stepson. She mentioned him only briefly, did not refer to him as her son or stepson, and expressed clearly and repeatedly her ongoing concern for her daughter and her daughter alone. It is little wonder that neither the prosecutor nor the State put forward this explanation previously.

**[4]** Second, a comparative juror analysis reveals, as one might expect, that the prosecutor *favored* jurors who had been the victims of domestic abuse or who had friends who had been victims of such abuse, even if the juror indicated that his or her experiences might affect his or her objectivity. Indeed, as in *Kesser*, "it seems that experience with domestic violence and abuse was not a liability, at least in the prosecutor's view. In fact, he might have found [a] woman a good juror precisely *because* she was the mother of a vulnerable daughter who, like [Ali's girlfriend,] had fallen victim to abuse." 465 F.3d at 367.

Juror 6, for example, described during voir dire an event that culminated in her husband's arrest: The husband, while drunk, began to physically abuse the couple's 15 year old son. When Juror 6 intervened, her husband shoved her backwards into the oven door, hard enough to incapacitate Juror 6. The police were called and the husband arrested. Although he spent a night in jail, no charges were filed.

As in M.C.'s case, the court asked Juror 6 whether the incident would influence her objectivity when evaluating Ali's case. She replied,

> I think I would be fair and impartial. It did affect me. I do believe that people do things under the effects of certain drugs or alcohol that maybe they wouldn't ordinarily do.

Two questions later, she clarified that she thought drug use was "a factor to evaluate," but did not automatically excuse murder. She was not asked follow-up questions regarding her objectivity.

Juror 6's status as the direct victim of domestic violence provided her with a slightly closer connection to Biletnikoff than M.C., who was the mother of the victim. Nonetheless, it is difficult to see how her response to the court's question about how the incident would affect her objectivity was less equivocal than M.C.'s initial response. Compare Juror 6 ("I think I would be fair and impartial. It did affect me.") with M.C. (first stating "I really don't think — I don't think it would have any bearing. I don't know. I don't think it would[,]" but then answering an unequivocal "No" when asked "Would there be any lasting effect on either the defense or the prosecution in this case as a result of your experiences or knowledge about that?"). In addition, Juror 6, unlike M.C., did express some sympathy for the perpetrator, noting that "people do things under the effects of certain drugs or alcohol that maybe they wouldn't ordinarily do." This statement is particularly relevant in this case, because evidence introduced at trial showed that Ali was a chronic drug user and had been using drugs and alcohol on the days preceding Biletnikoff's murder.

A comparison of M.C. to Juror 8 is likewise instructive on this point. Like M.C., Juror 8 had experience with domestic violence. During voir dire, she explained that she had "several close friends who have been . . . sexually assaulted by some male figure in their life." She also stated that she had a close friend whose father had attempted to kill the friend's mother. When asked how these experiences might affect her approach to this case, she responded,

> I guess what I was trying to say in the questionnaire was that if I learned that there had been some kind of conflict with, you know, the defendant and the

Biletnikoff woman, I might be more sympathetic
with the victim.

In the questionnaire itself, she had written, "I believe that my
friend's experiences with sexual abuse by men will make me
biased against any man who may have assaulted or murdered
a woman." Although she later stated that she could "look at
[the case] objectively," she had the following exchange with
Ali's attorney after making that statement:

Q. This is indeed a domestic violence case. How do
you think you would be as a juror sitting on this case
having those experiences or at least through your
friend?

A. I cannot say that would not be part of my opinion
in my thought process. I wouldn't make a decision
just based on the fact that this involves domestic vio-
lence. A defendant here shouldn't be guilty just
because of that. It's not that. That plays into my
thought process, though.

. . .

Q. Saying that statement, from what I'm hearing,
there may be a little bit of bias if you sat as a juror
on this case; is that correct?

A. That's correct.

The prosecutor's failure to strike Juror 8 substantially
undermines one of his supposed reasons for striking M.C. —
that he was concerned about selecting a juror whose past
experiences with domestic violence might affect her objectiv-
ity as a juror. Juror 8 acknowledged, at several points, that she
might have problems remaining impartial if the case involved
domestic violence. In addition, Juror 8's statements were far
more equivocal than M.C.'s. She vacillated from "I might be

more sympathetic with the victim" to "I could look at [the case] objectively" and then back to "there may be a little bit of bias if [I] sat as a juror on this case."

In short, the prosecutor's reason for striking M.C. — her equivocal response to a question about the impact of a domestic violence incident on her objectivity — applies with equal or greater force to Jurors 6 and 8, both of whom he accepted. "The fact that [a proffered] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." *Miller-El*, 545 U.S. at 248.

The State argues that a potential juror, D.W., whom the prosecutor peremptorily struck from the jury, not Jurors 6 and 8, is the most appropriate person for a comparative analysis as to the prosecutor's explanation regarding experience with domestic violence. D.W., like M.C., described an incident involving the molestation of one family member by another. In D.W.'s case, his eight-year old son had molested his two-year old daughter.

A comparison of M.C. to D.W., however, only confirms that the prosecutor was concerned with the *direction* of a juror's bias, not with objectivity. As noted, M.C.'s discussion of her daughter's molestation was focused entirely on the effect that the incident had had on her daughter's life. M.C. mentioned the alleged perpetrator, her husband's son by another woman, only briefly and only to point out that the boy had been living with her family for a very short time and was subsequently prohibited from contacting her daughter.

By contrast, the focus of D.W.'s discussion was almost exclusively on the actions of his son, the perpetrator of the crime. He even suggested that his daughter, the two-year old victim, did not remember and so was not affected by the incident. The reasonable inference, then, was that D.W. might be more sympathetic to Ali than the average juror.

More importantly, D.W. *actually expressed* a bias in favor of the defendant:

> DEFENSE: Can you give [the prosecution] a fair case? Can you give them a fair shake?
>
> . . .
>
> D.W.: I think I can give the prosecution a fair shake.
>
> DEFENSE: How about the defense?
>
> D.W.: I'm certain I can give the defense a fair shake.

M.C., on the other hand, never expressed a preference for the defense. She simply indicated originally that she did not think the molestation incident would affect her and, in the end, stated unequivocally that it would not.

**[5]** An analysis of the record supplies a third reason why the prosecutor's alleged concern with M.C.'s objectivity is implausible: his failure to clear up any lingering doubts about M.C.'s objectivity by asking follow-up questions. *See Kesser*, 465 F.3d at 364 (" 'We expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.' ") (quoting *Miller-El*, 545 U.S. at 244). After the trial court finished asking M.C. about the molestation incident, including questions about how the incident might affect her objectivity, the court provided the prosecutor with an opportunity to ask questions of his own. He did not do so.

This failure to seek clarification is even more striking in light of the fact that the prosecutor *did* ask a follow-up question on potential bias during the private voir dire of potential juror D.W., who, as noted, also relayed a molestation incident involving family members. At the end of D.W.'s interview, the trial court asked, "How do you think the circumstances of

this incident would influence you here in this case?" D.W. responded, "I don't think they have any impact whatsoever." At that point, the judge asked the prosecutor if he had any questions. Unlike in the questioning of M.C., the prosecutor responded affirmatively, and proceeded to ask D.W.:

> Very briefly. On that last question, sir, good morning. Does it — by impact, what we're looking to determine is does it cause you to be sympathetic to people at all that have problems of their own such that it might influence you, or the inverse, or it causes you to be intolerant to somebody that has committed a crime? Do you think it's a problem either way?

D.W. responded in the negative.

The prosecutor's failure similarly to ask M.C. a follow-up question indicates that his later alleged concern with her objectivity was a make-weight. Further, as it was apparent from D.W.'s responses that D.W.'s biases might lie with the defendant, the follow-up questioning of D.W. confirms once again the prosecutor was concerned with the direction of a prospective juror's bias, not with objectivity.

[6] Fourth and finally, while M.C. hesitated in her initial response to a very general question about the effect the molestation incident might have on her judgment as a juror, she later responded to a more specific question about whether the incident would have an "effect on either the defense or the prosecution in this case" with an unequivocal "no." As the district court stated, "[t]he record is replete with examples of other [unchallenged] jurors qualifying or even completely changing their answers." Juror 8, for example, vacillated on the issue whether she could remain objective. In her final statement about the issue, Juror 8 actually stated that she would be a little biased, whereas M.C. concluded by stating unequivocally that she could judge Ali's case objectively.

Given the answers of other jurors as to potential bias, M.C.'s alleged initial equivocal statements about her ability to remain objective could not have been a neutral reason for excusing her from jury service in the case.

**[7]** In sum, a comparison of M.C. to Jurors 6 and 8 and to potential juror D.W. demonstrates that the prosecutor favored potential jurors who, like M.C., were likely to sympathize with the victim and disfavored those, like D.W., who may have been biased towards the defendant. This comparative analysis therefore leads to only one reasonable conclusion: the prosecutor's asserted concern about objectivity was not an actual reason for his decision to strike M.C., but was pretext.

### 1.b.    M.C.'s Involvement in the System

**[8]** An analysis of the record as a whole likewise invalidates the prosecutor's statement that he struck M.C. because of an alleged concern with M.C.'s involvement in the criminal justice system.

**[9]** Nothing in the record indicates that M.C. had had a negative experience with the criminal justice system that might bias her against the prosecution. In fact, the opposite is true: When questioned about her interactions with public officials following the attempted molestation incident, M.C. informed the court that she thought that the process that she and her daughter had gone through was "fair," and that the police had treated her and her daughter with respect.

**[10]** In *Kesser*, we rejected in similar circumstances the prosecutor's alleged concerns about a juror's involvement with the criminal justice system, noting that the record

> show[s] that [the struck potential juror] felt comfortable with a system that had prosecuted and incarcerated her father for the offense. When she was asked if she was 'satisfied with [the] conclusion' of the

proceedings, she answered "Yes." On her question-
naire, she also answered that she was satisfied with
the response of the police, the district attorney, and
the court system.

*Kesser*, 465 F.3d at 364. "In fact," we observed, the struck
potential juror "seems a better juror for the prosecution than
others who were accepted despite minor run-ins with the law
that might foster resentment." *Id.* at 365.

[11] As in *Kesser*, there were other jurors in this case who
had experience with the criminal justice system but were not
struck. Juror 7, for example, had actually been arrested and
prosecuted (including a court appearance) for a minor crime.
She described the incident as "a very negative experience,"
although she did note that the police had been respectful and
that her bitterness over the affair was directed primarily
towards an ex-roommate. Nonetheless, if "involvement with
the system" was a legitimate concern of the prosecutor, he
would almost certainly have struck Juror 7. Moreover, like the
juror in *Kesser*, M.C. was, if anything, a better juror for the
prosecution than juror 7 who was accepted despite an arrest
that she described as "a very negative experience."

Juror 6 also had experience with the criminal justice sys-
tem: Juror 6's husband had been arrested for assaulting her
and had spent a night in jail. Although charges were never
filed, Juror 6 hired an attorney in response to the arrest, and
the attorney "handled" the matter with the district attorney's
office and the police department. Thus, Juror 6 also had some
involvement with the criminal justice system.

[12] In sum, even if severed from the objectivity rationale,
the prosecutor's "involvement in the system" explanation for
his strike of M.C. is not, on the record as a whole, a plausible,
race-neutral justification for the strike. No court could reason-
ably conclude otherwise.

### 2.   Reason 2: M.C.'s Expectation that the Attorneys Would Act Professionally

During an exchange with Ali's counsel, M.C. provided the following views on the conduct of lawyers:

DEFENSE: Do you have any opinions about criminal defense attorneys?

M.C.: No.

DEFENSE: Do you think they will say or do anything to get their clients off?

M.C.: Well, I haven't had that much experience in being in the company of defense attorneys or attorneys at all. I feel that they will do the right thing for their client. Their position is to go the last line for their client. I would hope that that would be done in a decent and respectable manner.

DEFENSE: I understand that. Any opinions about prosecutors, they'll say or do anything to get a conviction?

M.C.: My same statement goes for them as well.

DEFENSE: You would hope that everybody would act professionally?

M.C.: Yes.

DEFENSE: Let me ask you this: If at sometime during this trial we, Mr. Buenaventura [the defense attorney's co-counsel] and I, have to sort of aggressively cross-examine some witnesses, how would you feel about that?

M.C.: Well, I believe that as long as you don't cross the line of being disrespectful and still keep it in a professional matter.

DEFENSE: You wouldn't penalize us for aggressively advocating for our client?

M.C.: No.

DEFENSE: Just as long as we do it in a respectful, professional manner?

M.C.: Yes.

DEFENSE: That seems fair.

The prosecutor later asked M.C. a series of similar questions, eliciting nearly identical answers.

M.C.'s expectations regarding the conduct of the attorneys during trial was the basis for the prosecutor's second race-neutral reason for his strike. As the prosecutor explained, "No. 2, [M.C.] was very emphatic that — about — to Mr. Morales, and then to me later, about her concerns about attorneys and the way they conducted themselves in the courtroom; that if it was anything less than professional and respectfully done that would affect her." He further clarified that his concern was that she would view "aggressive" cross-examination as unprofessional conduct and hold that against one side or the other.

The district court did not credit this explanation. It noted that "[t]he prosecutor himself gave a short speech about the level of professionalism the attorneys would maintain during the trial, thus suggesting that [M.C.'s] expectation was not unreasonable or particularly relevant to [M.C.'s] ability as a juror." It also pointed out that Juror 1 had expressed similar

expectations regarding the professionalism of the attorneys, but had not been struck.

**[13]** We agree with the district court. As the above excerpt reveals, M.C. simply expressed reasonable expectations concerning attorney behavior. She did *not* say, as the prosecutor stated during the *Wheeler/Batson* hearing, that unprofessional conduct or aggressive cross-examination would "affect her judgment." *See Wheeler/Batson* Hearing Transcript (Prosecutor: "[T]hat it would occur [to M.C.] to say it would affect her judgment was unreasonable"). Instead, she said the opposite — that she would *not* penalize the attorneys for aggressively advocating on behalf of their clients. The prosecutor's mischaracterization of M.C.'s testimony is evidence of discriminatory pretext. *See Miller-El*, 545 U.S. at 244.

The voir dire transcript also demonstrates that Juror 1, who the prosecutor did not strike, expressed similar expectations about the lawyers' conduct.

> DEFENSE: . . . [Do you have] any opinions about defense attorneys or prosecutors. They'll say or do anything to win?
>
> JUROR 1: No, no. Not any more than a policeman might lie.
>
> DEFENSE: I take it you say that because we sort [sic] have been talking a lot about police officers and witnesses and stuff like that?
>
> JUROR 1: Exactly, exactly. Then you said earlier that everybody should act professionally and above-board.
>
> DEFENSE: You probably agree with that statement.
>
> JUROR 1: Absolutely.

**[14]** Given that M.C.'s expectations were reasonable, that they were fully consistent with the prosecutor's own views about the level of professionalism that the lawyers would maintain during the trial, and that they were very similar to those of a juror who the prosecutor did not challenge, the prosecutor's "professionalism" justification, like his first explanation for his strike of M.C., is contradicted by the record. We therefore agree with the district court that the attorney professionalism explanation was not genuine and that the California courts unreasonably accepted it as non-racially motivated.

### 3.  Reason 3: M.C.'s Reluctance to Judge

The prosecutor's third reason for striking M.C. was based on the following exchange between M.C. and Ali's counsel:

> DEFENSE: I believe in your questionnaire that you said you are a regular member of a church?
>
> M.C.: Yes.
>
> DEFENSE: Anything about your spiritual training or spiritual practice that will prevent you from judging other people if you're chosen to be a juror?
>
> M.C.: No.
>
> DEFENSE: You had to think about that for a second.
>
> M.C.: Just because the phrase "judging." Here in this position would mean something totally different than I would apply as far as my Christian faith would be interpreted. More or less this is to make a decision based on information I've gained. Judging to me means I've made a decision based on no information, just from what I see and not knowing the person or just arbitrarily. To me, that's a difference.

DEFENSE: I understand that difference. We're going to do our best, and as you've heard over and over again, it's [the prosecutor's] job to present evidence, and he will do his best to present lots of evidence to you, and the defense may also present evidence to you. But at the end of the day, there still may be some questions about what exactly happened or what somebody was actually thinking.

M.C.: Yes. That's true.

DEFENSE: What I'm saying is you may not have exactly every fact that you need when you retire back to the jury deliberation room.

M.C.: That's correct. But then that would be — to me that would be — I wouldn't say that's judging. That would be making a decision based on the evidence that has been presented and taking that into consideration.

DEFENSE: What you're saying is that you would do your very best with the information that you have?

M.C.: Yes.

At the *Wheeler/Batson* hearing, the prosecutor explained why this exchange provided him with a race-neutral reason to strike M.C.:

No. 3, Your Honor, the question was posed to her and it was posed by the defense about what she felt in terms of sitting in judgment of others. Her response to that was a pause, reflection, and then she said, yes, that could be a problem for her, sitting in judgment of others, because she was thinking of her Christian faith . . . I thought there was hesitancy in what she said.

The district court recognized that the prosecutor misstated M.C.'s testimony about her ability to judge others, but nonetheless credited this explanation. We do not agree, for several reasons.

**[15]** First, we have already concluded that the prosecutor offered two (or three) pre-textual reasons for striking M.C. That the other reasons were pretextual raises an inference that this final rationale is also a make-weight. As the Supreme Court explained in *Snyder v. Louisiana*, 128 S.Ct. 1203, 1212 (2008), "the prosecution's proffer of [one] pretextual explanation naturally gives rise to an inference of discriminatory intent," even where other, potentially valid explanations are offered. *See also Kesser*, 465 F.3d at 360 ("[I]f a review of the record undermines the prosecutor's stated reasons, *or many of the proffered reasons*, the reasons may be deemed a pretext for racial discrimination.") (emphasis added) (internal quotation marks and citations omitted); *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) ("[T]he fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against [the] sufficiency [of the remaining two reasons].").

**[16]** Second, the prosecutor once again mischaracterized M.C.'s comments, thereby providing further evidence of pretext. *See Miller-El*, 545 U.S. at 244. M.C. did not state, as the prosecutor suggested, that her Christian faith would make it difficult for her to judge Ali. She quite clearly indicated that jury service did not qualify as the type of "judging" that would conflict with her religious beliefs.

Moreover, M.C.'s statements about her Christian faith were elicited by the defense attorney. Although the prosecutor subsequently questioned M.C. at length, he did not ask a single question about her religious views or the implications of those views. This failure to inquire makes the mischaracterization of M.C.'s "Christian faith" response all the more indicative of pretext. For, as in *Miller-El*,

"[p]erhaps [the prosecutor] misunderstood, but unless he had an ulterior reason for keeping [the juror] off the jury we think he would have . . . cleared up any misunderstanding by asking further questions . . . ." *Id.* at 244.

Third, although the district court relied on a comparison of M.C. with potential juror Marck in upholding the prosecutor's "Christian faith" rationale, that comparison in fact provides no support for the religion justification. Marck identified herself as a practicing Buddhist. When asked about her religious beliefs, Marck stated that they would not interfere with her ability to judge Ali because his case was not a capital case. Noting that the prosecutor struck Marck, the district court concluded that the "prosecutor's concern with the effect of religious beliefs on a juror's ability to remain objective was equally applied to minority and non-minority jurors."

Marck's voir dire was different from M.C.'s, however, in two important respects. First, Marck did, in fact, indicate that her religious beliefs would affect her ability to sit as a juror under certain circumstances — i.e., in capital cases. M.C., on the other hand, clearly stated that her religious beliefs could not conflict with jury service under any circumstances because the word "judging" "mean[s] something totally different" in the context of jury service. Although Ali's murder trial was not a capital trial, the prosecutor could reasonably have had qualms about a potential juror who admitted that she could not vote in favor of the prosecution in certain circumstances for religious reasons. M.C., however, did not qualify her ability to judge a criminal case in any way.

**[17]** Second, Marck, like M.C., explained the effect that her Buddhist beliefs would have on her ability to judge Ali in an exchange with defense counsel. Unlike in M.C.'s case, the prosecutor asked Marck follow-up questions about her religious beliefs. Thus, when the prosecutor was concerned about a juror's religious views, he specifically asked about them. His failure to do so in M.C.'s interview indicates that he did

not think the issue was a significant one in her case. *See Miller-El*, 545 U.S. at 244 ("[W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.") (internal quotation marks and citations omitted).

This conclusion is confirmed by the prosecutor's failure to ask follow-up questions of Juror 3, who identified himself as a Jehovah's Witness and was not struck. When asked by defense counsel how his "spiritual practice" might affect his ability to serve as a juror, Juror 3 stated, "I don't believe [it would.] I believe I can fairly and impartially consider whatever testimony and evidence would be presented and make a judgment based on that, regardless of background and my involvement." These statements are arguably more equivocal than M.C.'s unqualified statement that she would be able to engage in the type of judging required of a juror. Yet, as in M.C.'s case, the prosecutor did not ask Juror 3 any questions about religious beliefs. This parallel further confirms that M.C.'s religious views were not a cause of concern to the prosecutor.

### 4. Conclusion — M.C.

[18] In sum, an analysis of the "totality of the relevant facts," including a comparison of M.C. to other potential and actual jurors, convincingly refutes each of the prosecutor's non-racial justifications for his peremptory challenge of M.C. We are therefore "compell[ed] [to conclude] that his actual and only reason for striking [M.C.] was her race." *Kesser*, 465 F.3d at 360. Moreover, "the California courts, by failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine." *Id.* at 358. In so doing, the California appellate court, like the district court, reached a conclusion regarding the prosecutor's intent that was not only incorrect, but unreasonable. *See Miller-El*, 545 U.S. at 266.

### B.    The Prosecutor's Challenge of Juror Darrell Jefferson

**[19]** "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 128 S.Ct. at 1208 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). As the record compels a finding that the prosecutor's removal of M.C. was racially motivated, we need not evaluate the validity of the prosecutor's peremptory challenge of Darrell Jefferson. We do so briefly, however, because the weakness of at least two of the prosecutor's justifications for challenging Jefferson lends further support to our conclusion that M.C.'s strike was racially motivated.

The prosecutor stated that he struck Jefferson because (1) he feared that Jefferson would "over-intellectualize" the decision-making process; (2) Jefferson had provided a "smart-ass" answer to one of his questions; (3) Jefferson exhibited a casual attitude; and (4) Jefferson had discussed criminal cases with his brother, whom the prosecutor mistakenly believed to be a criminal defense attorney.

The prosecutor's first justification is highly questionable. During voir dire, Ali's attorney asked Jefferson if he would be able to keep an open mind throughout a multi-week trial and not decide the case until he deliberated with other jurors. Jefferson responded in the following way:

> JEFFERSON: Can I rephrase the statement?
>
> DEFENSE: Absolutely.
>
> JEFFERSON: I think I would be able to continuously evaluate, but the way I think people work is — I mean, you make decisions and then you change them and then you change them. That's the way as things are presented to you.

DEFENSE: As you sit here today, if you're chosen to be a juror, you think that you would do that?

JEFFERSON: Yes. Continuously evaluate.

DEFENSE: So you may decide on Monday, looks like he is guilty, and then hear a little bit more testimony, and on Tuesday, then change my mind, well, he is not guilty, and then go back and forth in that manner.

JEFFERSON: Yes, probably.

Jefferson then explained that, in his opinion, adaptive decision-making is "just the way people's minds work."

The prosecutor cited the above exchange as evidence that Jefferson would "over-intellectualize" the decision-making process and would not keep an open mind during the trial. The State makes this argument again on appeal, noting that California's standard jury instructions inform jurors that they are not to decide an issue until the case has been submitted. *See* CALJIC No. 0.50.[7]

[20] As the trial judge pointed out, however, Jefferson's willingness constantly to re-evaluate his position is evidence of open-mindedness, not closed-mindedness. In addition, Jefferson's statements are likely an accurate assessment of the natural decision-making process and do not indicate an unwillingness to follow the law. The prosecutor's characterization of Jefferson's statements as demonstrating an unwillingness to keep an open mind is therefore dubious, and, in

---

[7]CALJIC No. 0.50 reads in relevant part: "During the course of this trial and before you begin your deliberations, you must keep an open mind on this case and upon all of the issues that you will be asked to decide. In other words, you must not form or express any opinions on this case until the matter is finally submitted to you."

turn, raises doubts about the legitimacy of his first reason for striking Jefferson.[8]

[21] The prosecutor's third justification for removing Jefferson, Jefferson's alleged "casualness," is likewise weak. *See Kesser*, 465 F.3d at 364 (noting that the prosecutor's rationale for striking a potential juror, that the juror was "emotional about the system," was "so underdeveloped that it likely falls short of *Batson*'s mandate for a 'clear and reasonably specific' explanation of the legitimate reasons for exercising the challenges.") (alteration omitted). Although Jefferson joked with the court on a couple of occasions, his lengthy voir dire indicates that he was a thoughtful individual who would have taken the trial seriously. The trial court itself noted that "given [Mr. Jefferson's] thoughtful answers, his demeanor, his background, . . . [h]e, from this perspective, would have been an excellent juror." Moreover, the trial judge joked with a number of seated jurors during voir dire and acknowledged that he had made efforts to "keep things reasonably open and not too tense so that the jurors would be more apt to answer truthfully and expose their feelings about various matters if they felt they were comfortable." So, to the extent that Jefferson did engage in "lighthearted banter," it was with the encouragement of the trial court.

The prosecutor also failed to explain why a casual or lighthearted demeanor would render Jefferson unfit for jury ser-

---

[8]Ali argues that a comparative juror analysis also supports a finding that the prosecutor's "over-intellectualizing" justification is pretextual. More specifically, Ali argues that the prosecutor failed to strike a number of jurors who exhibited "intellectual proclivities," including one juror who stated that he was "trained in logical thinking." A comparative juror analysis is not useful with respect to this justification, however. The prosecutor's alleged reason for striking Jefferson was not that Jefferson was too intellectual in general, but that he would "over-intellectualize" the decisionmaking process. No other seated or potential juror discussed his or her decisionmaking processes. As a result, it is not possible to compare Jefferson to other jurors with respect to this issue.

vice. Like the "emotional about the system" justification offered by the prosecutor in *Kesser*, the prosecutor's "casualness" rationale is "so underdeveloped that it likely falls short of *Batson*'s mandate for a 'clear and reasonably specific' explanation of the legitimate reasons for exercising the challenges." *Kesser*, 465 F.3d at 364 (alteration omitted); *see also id.* ("Even if the prosecutor could establish that [the struck juror] was unusually pretentious about her work, he offered no explanation about how this would render her unsuitable for the jury."). It also seems to contradict the prosecutor's alleged concern that Jefferson would "over-intellectualize" the decisionmaking process.

Although two of the prosecutor's justifications for challenging Jefferson are exceedingly weak, we acknowledge that his other two reasons for removing Jefferson find some support in the record. Jefferson twice responded to questions from the prosecutor with answers that the prosecutor credibly could have viewed as sarcastic or hostile. Ali does not identify a single unchallenged juror who made similar remarks.

The prosecutor's concern about Jefferson's close relationship with a criminal defense attorney also appears to be credible. Jefferson asserted during his voir dire that his brother was an attorney who had represented the defendants in two criminal cases that were heard by the Supreme Court. Jefferson also acknowledged that he had discussed the cases with his brother at length. Although the relevant cases involving Jefferson's brother were, in fact, civil cases and Jefferson's brother was not a criminal defense attorney, it was reasonable for the prosecutor to rely on the information that Jefferson provided during his voir dire.

A comparative juror analysis also reveals that Jefferson's exposure to the legal system through his brother was unique among the jurors. Two unchallenged jurors had relatives who were practicing attorneys, but both of these jurors stated that they did not discuss cases with these relatives. The record

therefore substantiates the prosecutor's contention that he struck Jefferson because of a concern about Jefferson's asserted connection to a criminal defense attorney.

Overall, the validity of the prosecutor's decision to challenge Jefferson is a close question. Two of the prosecutor's proffered explanations for the strike are entirely unconvincing, while the two others could be legitimate. If Jefferson had been the only African-American juror that the prosecutor struck, we might well affirm the district court's denial of Ali's petition.

**[22]** But Jefferson was not the only African-American the prosecutor peremptorily challenged. He also struck the only other African-American potential juror, and, in so doing, provided several pretextual explanations for that strike. In light of this additional strike, the prosecutor's proffer of two questionable explanations for his strike of Jefferson take on a significance that they might otherwise lack. *See Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003) ("The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge."). At a minimum, these dubious explanations reaffirm our conclusion that the prosecutor's actual reason for striking M.C. differed from those that he asserted and that his ulterior motive was race-based. *See Kesser*, 465 F.3d at 369 ("The prosecutor's willingness to make up nonracial reasons for striking [three minority jurors] makes it even harder to believe that his reasons for striking [a fourth juror] were race-neutral.").

## IV.  Conclusion

**[23]** Taken as a whole, the record compels a finding that the prosecutor's non-race based reasons for peremptorily striking M.C. were pretexts. The fact that the prosecutor peremptorily struck the only other African-American juror in the jury pool and provided at least two implausible reasons for

that challenge reinforces this conclusion. We therefore hold that both the California Court of Appeal and the district court clearly erred when they found that Ali failed to establish purposeful discrimination. We further hold that, in light of the overwhelming evidence indicating that the prosecutor in Ali's case acted with discriminatory intent when he struck M.C., the California appellate court's finding to the contrary was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2). We therefore reverse the judgment of the district court and remand with directions to issue a conditional writ of habeas corpus requiring Ali's release from custody, unless the State elects to retry Ali within a reasonable time to be determined by the district court.

REVERSED and REMANDED.