**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AVERILL W. BRIGGS,
          *Petitioner-Appellant,*

v.

RANDY GROUNDS, Warden,
          *Respondent-Appellee.*

No. 10-16683

D.C. No.
5:08-cv-03856-
RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, Senior District Judge, Presiding

Argued and Submitted
February 14, 2012—San Francisco, California

Filed June 15, 2012

Before: Susan P. Graber, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge Berzon

## COUNSEL

Mark D. Eibert, Half Moon Bay, California, for the petitioner-appellant.

Stan Helfman, Office of the California Attorney General, San Francisco, California, for the respondent-appellee.

## OPINION

TALLMAN, Circuit Judge:

Petitioner-appellant Averill W. Briggs ("Briggs") appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition challenging his jury conviction for one count of committing a forcible lewd act upon a child under 14 years of age; eight counts of aggravated sexual assault of a child under 14 years of age—including four counts of oral copulation, two counts of rape, one count of sexual penetration with a foreign object, and one count of sodomy; and first-degree burglary. Briggs is currently serving a sentence of 265 years to life for those convictions. In his petition, he argues that the prosecutor's use of peremptory challenges to strike three African American prospective jurors violated his rights under the Equal Protection Clause of the Fourteenth Amendment. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.

I

A

On June 9, 2002, Briggs climbed through a second-floor window of an apartment building in the Lockwood Tevis neighborhood of Oakland, California, and sexually assaulted two 13-year-old Asian girls. In picking the jury, the prosecutor intended to rely on the following evidence on which the jury later convicted Briggs: the medical examiner's report that confirmed one of the girls sustained oral, anal, and genital injuries from blunt penetration trauma, both victims' pretrial identification of Briggs, and evidence of Briggs's fingerprints recovered from the scene. There was, however, no DNA evidence.

Briggs was sentenced to 50 years to life, followed by seven consecutive sentences of 30 years to life, plus five years for a prior conviction, for a total sentence of 265 years to life.

B

The Alameda County Superior Court jury pool consisted of 65 people.[1] During the selection process the district attorney

---

[1]Briggs's opening brief makes much of the fact that this trial was held in Oakland, California, without any African American jurors. By focusing solely on Oakland, however, Briggs overlooks the fact that the jury pool is drawn from the entire county of Alameda. Thus, instead of drawing from a population solely from Oakland, which the petitioner cites as being 30.8 % African American, the pool was drawn from a county that in 2000 was 14.9 % African American and in 2010 was 12.6 % African American. U.S. Census Bureau, *Alameda County—General Demographic Characteristics: 2000*, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last visited Apr. 13, 2012); U.S. Census Bureau, *Alameda County, California: 2010* (Jan. 31, 2012), http://quickfacts.census.gov/qfd/states/06/06001.html. In any event, this point is misleading because "under a *Batson* challenge, we do not hold against the government the fact that the panel lacked African-American members." *United States v. Collins*, 551 F.3d 914, 920 (9th Cir. 2009). Briggs has never asserted that the potential jurors were drawn from a non-representative cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357, 363-64 (1979).

used eighteen of her twenty peremptory challenges. Three of those challenges struck African American prospective jurors: Lawrence L., Georgia M., and Sam R.[2] One prospective African American juror was excused for cause. The prosecutor thus struck fifteen non-African American jurors peremptorily.

After the prosecutor struck the second African American juror, Briggs challenged the action as racially motivated under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its California analogue *People v. Wheeler*, 583 P.2d 748 (Cal. 1978). Briggs again pressed his challenge after the prosecutor used a peremptory strike to excuse the third African American prospective juror. The trial judge held a hearing at which she considered the prosecutor's explanations for exercising her challenges as to each individual prospective juror. The judge concluded the prosecutor excused these three jurors for "non-race based reasons and they're valid."

After the trial, but before sentencing, Briggs moved for a new trial, based in part on the same argument that the prosecutor had misused her peremptory challenges to strike Lawrence L., Georgia M., and Sam R. Briggs also offered a comparative jury analysis to rebut the prosecutor's race-neutral explanations for her challenges. The trial court heard argument on the motion and affirmed its previous ruling that the prosecutor had a race-neutral reason for exercising her peremptory strikes for each challenged juror:

> There was a race-neutral reason for each one of the three that [defense] were concerned about. Miss M. just basically said she could not follow several points of law, there was Mr. L. who had been accused of sexual harassment, and then there was Mr. R. who basically thought teens were susceptible to coaching, and there were some other reasons for each one of

[2]Throughout this opinion we use juror numbers or abbreviated names instead of the jurors' full names to protect their privacy.

them. But *all* the reasons that she gave, the reasons that she felt that they would not be jurors that she wanted on that panel, were legitimate.

Briggs raised his *Batson* challenge again on direct appeal. At the time, an open question existed in California as to whether comparative jury analysis could be considered on appeal if it was made a part of the record after the trial court ruled on the *Batson* motion, but at some point before judgment was entered.[3] The state appellate court, nonetheless, considered the analysis in conjunction with its review of the individual jurors. The court reviewed the record to determine whether substantial evidence supported the trial court's finding that the prosecutor's challenges were not race based. The court then turned to the comparative analysis, finding nothing in it that "undermine[d] [its] earlier conclusion that substantial evidence support[ed] the trial court's *Batson-Wheeler* ruling" and affirmed the trial court. The California Supreme Court denied review.

Briggs filed a federal habeas petition. The district court also examined the comparative jury analysis and voir dire record and held that no *Batson* violation had occurred. Briggs timely appeals.

II

**[1]** A *Batson* challenge has three steps: first, "the defendant must make a prima facie showing that a challenge was based on race"; second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown "purposeful discrimi-

---

[3]The Supreme Court later answered this question in the affirmative. *Miller-El v. Dretke*, 545 U.S. 231, 241 nn. 1, 2 (2005) (using a comparative analysis that relied upon the voir dire transcript that was a part of the record before the state court, where the defendant offered the analysis after judgment).

nation." *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009); *see Batson*, 476 U.S. at 96-98. The sole dispute before us is whether the state appellate court reasonably applied *Batson*'s third step. To decide this issue, we must consider the "totality of the relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (internal quotation marks omitted).

A

"To determine whether race was a substantial motivating factor—that is, whether the defendant has shown purposeful discrimination at *Batson*'s third step—the trier of fact must evaluate the persuasiveness of the justifications offered by the prosecutor." *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010) (internal quotation marks and brackets omitted). To decide whether the defendant has met his burden, the court must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation marks omitted). This inquiry includes comparing African American panelists who were struck with those non-African American panelists who were allowed to serve. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 245 U.S. at 241.

B

We review the state appellate court's finding that the prosecutor did not engage in purposeful discrimination under the deferential standard of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), we must defer to the California court's conclusion that there was no discrimination unless that conclusion "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."[4] Here our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it. *See Rice v. Collins*, 546 U.S. 333, 338-42 (2006); *see id.* at 341-42 ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

Although the dissent ultimately "recite[s] the proper standard of review, . . .[it] improperly substitute[s] its [de novo] evaluation of the record for that of the state [appellate] court." *Rice*, 546 F.3d at 337-38 (overturning the Ninth Circuit). While citing AEDPA, the dissent repeatedly suggests that we cannot credit the prosecutor's justifications because the defense's characterization of the challenged jurors' questionnaire answers contradict the prosecutor's characterization at the hearings before the trial judge. Dissent at 6929-30, 6932, 6936 n.6. The dissent seems to conclude that because we cannot independently verify the answers from the questionnaires as they are not in the record, the defense's characterization is equally, if not more, plausible despite the state court determinations to the contrary. However, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," *Jackson v. Felkner*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (internal quotation marks omitted) (overturning the Ninth Circuit). The dissent's readiness to doubt the state court determination based on the defendant's characterization of the record does not apply the appropriate level of deference Congress and the United States Supreme Court have required of us.

---

[4]We apply § 2254(d)(2) instead of § 2254(e)(1), because the evidence the petitioner relies upon is found in the record that was before the California Court of Appeal. *See Kesser*, 465 F.3d at 358.

Additionally, it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications. *See e.g.*, *Rice*, 546 U.S. at 343 (Breyer J. concurring) ("[T]he trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision."); *Hernandez v. New York*, 500 U.S. 352 (1991) ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." (internal quotation marks and citation omitted)). Given that the trial court *did* have the benefit of viewing the questionnaires and the prospective jurors who answered them when making a determination under *Batson*, and that the California Court of Appeal presumably had those questionnaires on review, we must defer to these credibility and factual findings.[5] *See Rice*, 546 U.S. at 338-39 ("[A] federal habeas court can only grant Collins' petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge. State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' " (quoting *Miller-El*, 545 U.S. at 240). Thus it would be anathema to AEDPA if we were to assume that the petitioner's contentions about the questionnaires are true simply because the record before us does not contain the excused jurors' questionnaires. The burden to disprove the factual findings rests with Briggs. 28 U.S.C. § 2254(e)(1) (requiring "clear and convincing evidence" to rebut "a determination of a factual issue made by a State court").

---

[5]Indeed, during the colloquy on Sam R., some confusion arose as to which questionnaire and question the prosecutor was referring. The trial court asked for clarification, after which the court allowed the hearing to continue, leading to the reasonable inference that the trial court was simultaneously reviewing the challenged jurors' questionnaires during the hearing and found no discrepancy. *See infra* page 6920-21.

## C

The trial judge held two hearings on Briggs's *Batson* motion before concluding that the prosecutor's explanations were not pretextual. The California Court of Appeal carefully reviewed the record for substantial evidence in upholding the trial court's findings, and the state appellate court's determination on review is "entitled to appropriate deference." *Cook*, 593 F.3d at 815; *see Felkner*, 131 S. Ct. at 1307.

The state appellate court also considered Briggs's comparative analysis and found it unpersuasive. The court rejected Briggs's analysis because it was incomplete in that it relied primarily upon comparisons of the jurors' questionnaire answers and failed to account for the differences between the same jurors' answers during voir dire. Thus a careful examination of the full record, along with consideration of the prosecutor's justifications as a whole, supported the trial court's determination that the challenges were non-discriminatory. Moreover, on federal habeas review, the district court evaluated the voir dire transcript, conducted comparative juror analysis where possible, and found that the state-court's determination was not objectively unreasonable. We agree.[6]

---

[6]Where the state court conducted comparative analysis and determined that the prosecutor did not exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and we need not undertake comparative analysis de novo. The state court was explicit that it considered and rejected Briggs's comparative analysis, but it did not give a detailed explanation for rejection of each of the proffered justifications. In *Miller-El*, 545 U.S. at 241, the Court "*presumed* [that] the trial court and state appellate court did not undertake [such] analysis because [it] was not detailed in their opinions." *Green v. LaMarque*, 532 F.3d 1028, 1030 n.2 (9th Cir. 2008). Here the state appellate court did, however, give some specific reasons why the comparative analysis failed to show purposeful discrimination at step three. Thus, we include a detailed comparative analysis only where appropriate.

### 1. Juror Lawrence L.

The prosecutor used her first peremptory challenge to strike Lawrence L. As justification for the challenge she offered five reasons: (1) Lawrence L. had been accused of sexual harassment, which he failed to include on his questionnaire; (2) he stated that it would be difficult for him to convict on the word of only one witness because of his own experience as the subject of a sexual-harassment investigation; (3) he admitted to the court that he would hold the prosecution to a higher standard of proof than required by law; (4) he thought that the believability of teenagers was affected by what they see and hear at home; and (5) he failed to answer other written questions that pertained to the burden of proof or the types of witnesses who would be presented at trial.

**[2]** Both the trial court and the appellate court concluded that the prosecutor's strike rested primarily on Lawrence L.'s involvement in the workplace-sexual-harassment investigation and the concern that his involvement would affect how he viewed the witnesses in Briggs's case: two teenage victims of sexual assault.

**[3]** The state appellate court found that both Lawrence L.'s questionnaire and his statements during voir dire supported the trial court's determination that the prosecutor's reasons for striking Lawrence L. were race-neutral. For example, during voir dire the following exchange between Lawrence L. and the trial judge occurred:

> Q. [prosecutor] Based on your experience, though, do you think you would be more demanding than the law requires in terms of the evidence?
>
> A. Yes.
>
> Q. [Court] Now, everyone, and we've talked about this, the requirement is proof beyond a reasonable doubt.

A.  Yes.

Q.  Not proof beyond any possible doubt. So her standard is proof beyond a reasonable doubt. Would you hold her to proof beyond any reasonable doubt?

A.  Yes.

At another point during voir dire, Lawrence L. also indicated that it would be difficult for him to be a fair juror because he was "in a sexual harassment case, and . . . didn't like the way it came out." No other juror was accused of sexual harassment, so comparative analysis is of little help. *See Cook*, 593 F.3d at 817 (comparison to a juror who is not "otherwise similar" nullifies the comparative value). Based upon our review of the record, it was not objectively unreasonable for the California Court of Appeal to find that substantial evidence supported the trial court's determination that the prosecutor challenged Lawrence L. for race-neutral, legitimate reasons.

### 2.  Juror Georgia M.

The prosecutor exercised her fourth challenge to excuse Georgia M. The prosecutor gave the following justification for challenging Georgia M.:

Mr. Steckler, when he got up to do his voir dire of Miss M. with some of the other jurors, directed a question, first a comment then a question to Miss. M. He said to Miss M. as well as [Lawrence L. and two other jurors], he said, it sounded as though when you were talking to the prosecutor, that you were not going to follow the law at the end of the case, and he then moved, . . . which signifies to me an acknowledgment on the part of the defense that there were answers given that warranted that remark by

counsel that he made as a blanket remark to four jurors, two of which were African American.[7]

He then went on to ask about the standard of proof, beyond a reasonable doubt, and Miss M. said, in fact, volunteered and said, well, if there's a slight doubt in your mind, then there's a reasonable doubt.

That is exactly why I was concerned for Miss. M., and that's corroborated by what she said to me when I probed. And she said that in response to my question: would you need a little bit more evidence because this is a sex case? She said yes, I do need

---

[7]As a preliminary matter, we note that the dissent finds this rationale "false" and therefore demonstrably pretextual, dissent at 6929, because defense counsel addressed three jurors, none of whom was Georgia M. There were, however, two instances during voir dire when defense counsel addressed this same group of jurors. The first encounter follows:

[Defense counsel] I have one kind of a mini group question, and this is primarily for Miss H., Mr. C., Mr. [Lawrence] L. and somewhat a little bit for Ms. [Georgia] M., and this is concerning the concept of proof beyond a reasonable doubt.

Just a show of hands who knows what proof beyond a reasonable doubt means.

PROSPECTIVE JUROR [GEORGIA M.]: I don't know if I know what it means. . . . I think I know what it means. It's when you —when a case or evidence or whatever, if there's a slight doubt that in your mind —okay.

In the other instance, defense counsel directed another group question pertaining to the burden of proof at Miss H., Mr. L., and Mr. C. and then immediately went on to question Georgia M. on a different topic. It appears that the prosecutor's reference confused the exact wording of the question that defense counsel posed in the first instance with the wording in the second, but her worry was explicitly identified as Georgia M.'s answer that "slight doubt" was equivalent to "reasonable doubt." Accordingly, this reason is not so easily labeled "false" and cannot be rejected out of hand. *See Rice*, 546 U.S. at 340 ("Seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible.").

more evidence. Other jurors did not have a question with that area that are seated.

Now, I should point out that Miss M. also indicated on page 18 of her questionnaire, as did Mr. S., who was not African American, and Mr. H., who was not African American, that I kicked, that they would hesitate to convict on the word of one witness alone.

She also indicated that whether sex victims were more or less believable, that she did not have an opinion.

Now, her ambivalence was significant to me because that, compounded with her lack of clear responses, indicated that she was impressionable and was impressionable in the direction of requiring more of me. And that's further corroborated by, when asked, do you think you'd require DNA, she said, depends how strong the other evidence is.

So this is someone who is clearly looking for, at least how I felt, stronger evidence than I would otherwise be required to present.

Now, she also said that she's not a good judge of telling the truth. And when I asked her, would you be hesitant to convict a defendant if you believed the victim's testimony beyond a reasonable doubt, the answer there, memorialized as well on page 18, is I don't know. Again, with regard to sentence, her answer is "I don't know."

Further, I did not have a good rapport with her. I did not get a warm feeling from her. I actually got a cold stare with little eye contact, had no connection

with her. And I noted that there was actually good rapport between defense attorney and herself.

Her answers were not answers that gave me any comfort, and the jurors that were coming up in the box were much stronger for me than she was. I felt like I would have to do more than the law required to persuade her, and I think that's corroborated again to go — going back where I started, the defense attorney's remark to her that it sounded as though you were not going to follow the law at the end of the case.

And, clearly, somebody who thinks slight doubt equals reasonable doubt is a scary juror for me.

[4] The prosecutor's fundamental concern was that Georgia M. would hold the prosecution to a higher burden of proof than the law required. The prosecutor offered several examples of Georgia M.'s questionnaire answers or voir dire statements that, cumulatively, supported this concern. Each detail the prosecutor cites may not necessarily constitute a stand-alone justification, but in total provided support for her overall concern with this juror. *See Cook*, 593 F.3d at 819-20 (noting individual factors that contributed to the prosecutor's concern with the "juror's overall demeanor"). The appellate court affirmed the trial court's determination that the prosecutor's overall concern regarding the burden of proof was credible. Six out of the seven factors identified by the prosecutor contributed to or compounded this concern.[8] We consider

---

[8]Although Briggs identifies eight justifications, a careful reading of the record reveals that, when the prosecutor referred to Georgia M.'s answer on page 18 of the questionnaire to whether she could convict on the word of one witness, and then referred to Georgia M.'s answer to whether she could convict on only the victim's uncorroborated testimony (also on page 18), the prosecutor was actually referring to the same questionnaire question. The only question on page 18 to which the prosecutor could have been referring was:

each related reason that the prosecutor cites for Georgia M. in light of that overarching concern.[9]

First, and most significantly, the prosecutor pointed out that not only did Georgia M. equate "slight doubt" with "reasonable doubt," but she also opined that the burden of proof increases with the seriousness of the crime charged.[10] The voir

---

> The law does not require a victim's testimony to be corroborated by other evidence. That is, if you believe a victim's testimony beyond a reasonable doubt, that alone is sufficient to find a defendant guilty.
>
> a.   Would you at all hesitate to convict a defendant of the charges if you believed a victim's testimony beyond a reasonable doubt?
> Yes___ No___
>
> b.   Would you at all hesitate to acquit a defendant of the charges if you disbelieved a victim's testimony beyond a reasonable doubt?
> Yes___ No___

Thus we treat this as one justification and not two separate ones.

[9]Contrary to Briggs's assertion that the sheer number of justifications belies pretext, upon careful examination it becomes evident that many of the prosecutor's justifications were facets of a deeper underlying concern that Georgia M. would not apply the correct legal standard. The quantity of the prosecutor's justifications alone, without examination of the quality of those justifications, cannot prove purposeful discrimination. *See Rice*, 546 U.S. at 340-41 (finding state-court determination that prosecutor did not exercise his peremptory challenges in a discriminatory manner was not objectively unreasonable despite concern about constitutionality of one justification where "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons").

[10]We recognize that the concept of reasonable doubt can be difficult to explain and, alone, this justification may not support the use of the strike. However, the prosecutor considered the compound effect of Georgia M.'s statement and the other answers that Georgia M. gave. The trial court credited that reasoning, the state court of appeal affirmed it, and—unless objectively unreasonable—we must defer to these determinations under AEDPA.

dire transcript and questionnaires support the prosecutor's justification. No other accepted juror made a similar combination of statements that would create doubt about that juror's ability to faithfully apply the law. In particular, no seated juror equated reasonable doubt with slight doubt or volunteered any similar statements.

As to the second justification—Georgia M.'s statement that a rape case would require more evidence than an auto-theft case—Jurors 6, 8, and 10 also answered "yes" to the question, "Would you require more evidence in a sexual assault case as opposed to another type of crime such as auto theft?" But none of those jurors repeated that answer during voir dire. In fact, each immediately answered "no"—more evidence is not needed—when asked. In contrast, Georgia M. was asked three times, twice by the prosecutor and once by the court, before she retracted her statement regarding the burden of proof. The prosecutor is not required to ignore Georgia M.'s repeated "yes" answer simply because she eventually acquiesced to the judge's explanations. *Cf. Rice*, 546 U.S. at 341 ("That the prosecutor claimed to hold concerns despite Juror 16's voir dire averments does not establish that she offered pretext."); *Cook*, 593 F.3d at 820 (crediting prosecutor giving more weight to initial questionnaire answers than voir dire answers when exercising challenges).

We also find support for this justification from the prosecutor's use of a peremptory strike to excuse at least one non-African American potential juror who indicated on her questionnaire, and reaffirmed during voir dire, that she would hold the prosecution to a higher standard of proof, even though she retracted that statement when pressed by the court.[11] *See Rice*,

---

[11]The dissent takes issue with our comparison of Georgia M. with this other non-African American excused juror, proposing alternative reasons why this juror was excused. *See* dissent at 6929-30. Because the prosecutor was not asked to explain her peremptory strike of this juror, it is speculation why that juror was excused. We note only that she presented similar characteristics to Georgia M. The Supreme Court in *Rice*, 546 U.S. at 341 used this very technique to find support for the prosecutor's justification for the use of a peremptory without comment on or consideration of other potential reasons the prosecutor excused the non-black potential juror.

546 U.S. at 341 ("Even if the prosecutor was overly cautious in this regard, her wariness of the young and the rootless could be seen as race neutral, for she used a peremptory strike on a white male juror, Juror 6, with the same characteristics."); *Ngo v. Giurbino*, 651 F.3d 1112, 1116-17 (9th Cir. 2011) (finding support for determination that prosecutor's justifications were not pretextual where prosecutor also struck other prospective jurors who presented similar characteristics).

The prosecutor's third justification is also closely related to her overall concern that Georgia M. would hold the prosecution to a higher burden. First, Georgia M. suggested that she would hesitate to convict on the word of one witness alone. Two seated jurors, 1 and 10, had similar answers to that question. Juror 1 simply checked "yes", whereas Juror 10 said "maybe" depending upon the factual circumstances. When questioned on voir dire, Juror 1 answered that the word of one witness would be sufficient, as did Juror 10. The prosecutor's justification is somewhat weakened by Georgia M.'s similar answer on voir dire, that she would be able to convict on the word of one witness if she believed that witness. Careful examination of the record shows, though, that neither Juror 1 nor 10 expressed the same ambivalence or lack of understanding that Georgia M. exhibited, which was what the prosecutor identified as troubling.

Instead, Juror 1 was able to clearly communicate and clarify his questionnaire answers. Juror 10 also gave succinct and direct answers to the questions posed during voir dire. Georgia M., on the other hand, expressed more than once that she did not understand various questions or legal concepts, and she agreed to follow the law only after the court interjected to explain certain points of law. The prosecutor explained that this ambivalence led her to believe that Georgia M. could be influenced by other jurors in how she would apply the burden of proof. As the prosecutor noted, she also struck two non-African American jurors for the same reason, lending further

support to the finding that the reason for the strike was not pretextual. *Ngo*, 651 F.3d at 1116. Briggs has not met his burden under AEDPA: nothing in the record dictates a finding that this reason was clearly pretextual.

Viewed in isolation, the prosecutor's fourth justification is somewhat weak. Review of the record, however, supports the state court's finding that this reason was not pretextual. Georgia M. answered that she did not know if sexual assault victims were more or less believable than other victims. And it was her uncertainty that concerned the prosecution: "Her ambivalence was significant to me because that, compounded with her lack of clear responses, indicated that she was impressionable . . . ." Each of the twelve seated jurors and the four alternates either wrote "no" without qualification or indicated that believability is based upon the individual. Although, as the dissent points out, a "no" answer to this question can be read to mean that the person has no opinion, thus indicating ambivalence, this does not make the prosecutor's concern that Georgia M. might have been easily influenced by other jurors clearly pretextual as it is the complete picture that we must analyze. Here, the prosecutor identified several reasons that led her to believe that Georgia M. would be easily influenced by fellow jurors. The fact that seated jurors shared *one* of those characteristics does not ineluctably lead to the conclusion that the prosecutor's concern was pretextual.

The prosecutor's fifth justification is also weak, but nonetheless supported by comparison to the seated jurors. The prosecutor cited Georgia M.'s "it depends" answer to the question whether, in the absence of DNA evidence, she could convict a defendant of a sexual crime. While eight other jurors gave similar answers to the DNA question, not one of these jurors shares *all* of the troubling characteristics that the prosecutor identified as contributing to her doubt of Georgia M.'s ability to apply the appropriate burden of proof. During both hearings on the *Batson* motion, the prosecutor explained

that her primary concern was compounded by Georgia M.'s ambivalence about whether she would require DNA evidence. The trial judge, after having observed the entire jury selection process, credited the prosecutor's explanation, and the appellate court affirmed. Nothing in the record contradicts those determinations.

The prosecutor's sixth justification—that Georgia M. said she was not good at assessing who is telling the truth—plausibly could compound the prosecutor's concern that Georgia M. would not be a good juror because she could be unduly influenced by her fellow jurors. Juror 8 said that she was "not really" a good judge of whether someone was telling the truth and Juror 1 said that he was "usually" a good judge of telling the truth, but not always. These similar answers somewhat undermine the prosecutor's reasoning, but the record does not rise to the level of clear pretext considering the combined effect of Georgia M.'s questionnaire and voir dire answers.

[5] Finally, the prosecutor noted that she did not have a "good rapport" with Georgia M. and that Georgia M. gave her a cold stare, while Georgia M. seemed to have a good rapport with the defense counsel. Although it could be, as the dissent points out, difficult to evaluate a prosecutor's reason if she stated only that she had a bad "feeling," this is simply not the case here.[12] The state trial court did not make a specific find-

[12]The dissent's citation to *United States v. Horsley*, 864 F.2d 1543 (11th Cir. 1989) (per curiam), is inapposite. We note, first, that a less deferential standard of review applied there, as *Horsley* was a direct appeal. Second, the prosecutor's justification in *Horsley* for excusing an African American juror was far different than the prosecutor's observation of rapport here. In *Horsley*, the prosecutor simply said, "I don't have any particular reason. I just got a feeling about him as I have about Mr. Gonzalez, and several others." *Id.* at 1544. Having *no* articulable reason is a far cry from the prosecutor's detailed justification for excusing Georgia M., in which rapport played a minor role. Furthermore, we note that we could not find, and the dissent does not cite, any Ninth Circuit precedent to support the distinction between a "rapport" and a demeanor-based justification.

ing about this justification, thus we cannot presume that the trial court credited or discredited this reason, but instead base our determination upon the other justifications that the prosecutor offered. *See Snyder*, 552 U.S. at 479. Consequently, because AEDPA " 'demands that state-court decisions be given the benefit of the doubt,' " we cannot say that the record shows it was objectively unreasonable for the trial judge to credit the prosecutor's justification as a whole. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)); *see also Rice*, 546 U.S. at 341.[13]

[6] The state court noted that the prosecutor's primary justifications for Georgia M. were her misunderstanding of reasonable doubt and her opinion that the burden of proof should be higher in a rape case. Four of the prosecutor's secondary justifications also support the prosecutor's primary concern. Viewing the justifications together, the most generous reading would suggest only that the state court had reason to question the prosecutor's justification for the strike of Georgia M. *Rice*, 546 U.S. at 341. "That does not, however, compel the conclusion that the [state] court had no permissible alternative but to reject the prosecutor's race-neutral justifications and

---

[13]The dissent argues that we must reject the rapport justification simply as it is unfalsifiable or non-verifiable on the record because it would be too easy for prosecutors to mask racial animus by claiming a lack of rapport with a juror. At its core this argument is not new or novel, and in fact similar contentions have been rejected. In *Batson* itself Justice Marshall noted the inherent difficulty in evaluating a prosecutor's justifications, 479 U.S. at 106 (Marshall, J., concurring). And in *Rice*, 546 U.S. at 343 (Breyer, J., concurring), Justice Breyer echoed this concern asking: "Insofar as *Batson* asks prosecutors to explain the unexplainable, how can it succeed?" Given the long history of *Batson* and its progeny, the Supreme Court has grappled with these questions many times, but it never has changed the framework of *Batson*. As such, even though we recognize the inherent problem of citing rapport, where the record is not clear as to whether the trial court relied upon or rejected that reason, under AEDPA, we cannot say it was unreasonable for the state court to find no constitutional violation of *Batson*.

conclude [petitioner has] shown a *Batson* challenge." *Id.* We cannot say, applying AEDPA, that the California Court of Appeal was objectively unreasonable in finding that substantial evidence supported the trial court's determination that the prosecutor exercised her peremptory challenge for race-neutral reasons.

### 3.   Juror Sam R.

The prosecutor offered the following reasons for challenging Juror Sam R.: (1) his demeanor and manner of responding to the prosecutor's questions on voir dire suggested that Sam R. was not taking the selection process seriously; (2) Sam R. was flippant and evasive in his answers; (3) Sam R. did not feel that he needed to talk to his teenage daughters about the potential for sexual assault; (4) Sam R. indicated during voir dire that he thought teenagers were more susceptible to coaching; (5) Sam R.'s answer that sexual assault victims are sometimes less believable because of age or personal background; (6) Sam R.'s "yes" answer to the question of whether he had a bias and his failure to explain that answer on voir dire; and (7) the prosecutor's perception that Sam R. would look for physical evidence because of his questionnaire answers.

[7] The district court noted that the prosecutor's fundamental concerns were her first and second justifications: Sam R.'s offhand demeanor, as well as his curt and sharp answers to her questions. Here, the trial judge was in the best position to evaluate the credibility of the prosecutor's demeanor-based reasons—the California Court of Appeal deferred to that evaluation, and we must as well. "[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor . . . , making the trial court's firsthand observations of even greater importance." *Snyder*, 552 U.S. at 477. The prosecutor clearly articulated how Sam R.'s behavior influenced her perception that he was not taking the process seriously and therefore would not be a good juror. This reason is credible. Indeed, the record shows that Sam R.'s answers were short and often

vague or evasive. Our review of the record reveals at least four exchanges between the prosecutor and Sam R. during which he answered her questions with questions or avoided giving any direct answer. *Cf. McClain v. Prunty*, 217 F.3d 1209, 1223 (9th Cir. 2000) (finding a demeanor-based challenge pretextual where "the prosecutor did not explain the significance of [the juror's body language] or otherwise indicate how that gesture evidenced bias"). Thus, nothing in the record shows that this reason was clearly pretextual.

The prosecutor's third justification is also not clearly pretextual. It seems to us completely logical that a prosecutor in a case that charges horrific sexual crimes against young teenage girls would be concerned with a juror who responds that he "never found the need to" discuss sexual assault with his own daughters when they were growing up. Briggs points to no seated juror who expressed the same ambivalence, nor can we find anything in the record to support his claim that this reason was clearly pretextual.

The prosecutor's fourth reason is also supported by the record. During voir dire the prosecutor asked Sam R.: "Well, do you think that teenagers are more prone to being coached [as witnesses]?" Sam R.'s response was: "At times, they are." We agree with both Briggs and the dissent that there was some confusion related to this justification and the prosecutor's next justification. "Seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible[,]" however. *Rice*, 546 U.S. at 340. It is plausible that the confusion merely stems from the related nature of the two questions,[14] and "[i]t is a tenuous inference

---

[14]The written question the prosecutor references in the fourth justification asks: "Do you feel a teenager is any more or less believable as a witness than an adult?" The written question the prosecutor references in the fifth justification asks: "Do you have any opinions that the victims of sexual assault are more or less believable than those who report being the victim of other crimes?"

to say that an accidental reference with respect to one" of Sam R.'s answers undermines the prosecutor's credibility. *Id.*

By including these questions on the questionnaire and focusing on them during voir dire, the prosecutor was presumably attempting to ascertain whether the potential jurors would find either sexual assault victims or teenagers or both less credible as witnesses. Her concern clearly related to the fact that the victims—teenagers subject to a violent sexual assault—possessed those characteristics and would be testifying. The prosecutor's reason is further supported by her statement that she believed part of the defense strategy would be to argue that the victims' identifications of Briggs were coached or suggested to them. And, indeed, Sam R. during voir dire said that teenagers could be coached. Thus we cannot, under AEDPA, simply credit the defense's version of Sam R.'s questionnaire answer. Even if we were discussing the same question in the fourth and fifth justifications—which we are not—we must credit the trial court's determination.

From the transcript it is apparent that the trial judge had the questionnaire in front of her during the *Batson* challenge. The trial judge recognized the confusion and asked the prosecutor to identify the exact question to which she was referring. The prosecutor gave the judge a page and question number, at which point the proceedings continued. The reasonable inference is that the answers matched up with the prosecutor's justification, not that the trial court eschewed the constitutional standards set forth in *Batson* by crediting a demonstrably false and pretextual justification. *See Visciotti*, 537 U.S. at 24 ("Th[e] readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law.").

We also find support for this justification by comparing Sam R. to other jurors whom the prosecutor also challenged: three non-African American jurors were excused who voiced similar opinions about the susceptibility of teenagers to

coaching as witnesses. Mr. S. stated on his questionnaire, and then confirmed during voir dire, that he believed teenagers were more susceptible to outside influence. Mr. H. also answered on his questionnaire that he believed teenagers might "just say what an adult has told" them. He explained during voir dire that it may depend on the individual, but that "it's more so with young teenagers." Ms. B. also agreed that teenagers would be "easier to lead" as witnesses. These comparisons support the conclusion that this reason was not pretextual.

The fifth justification was Sam R.'s questionnaire answer that sexual assault victims could be less believable due to age or personal background and his failure during voir dire to explain this opinion adequately. The prosecutor attempted to clarify Sam R.'s answer, but instead of directly answering her queries he equivocated:

> Q. You said that sometimes you think cases with victims of sexual assault are sometimes less believable, sometimes they're less believable because of age and personal background. What do you mean by that?
>
> A. Did I say that?
>
> Q. Yeah. I put a big old circle around it.
>
> A. Maybe I misunderstood the question.
>
> Q. Well the question was, do you have any opinions [that] victims of sexual assault are more or less believable. And that was the gist of the question. And then you thought that sometimes they're less believable. Why do you say that?
>
> A. I don't. Like I say, I misinterpreted the question, so.

Q. . . . What is it about somebody's age or personal background, in your view, that could affect the believability of a sexual assault victim?

A. They could be coached in the questions, but I don't think they're less believable.

Neither Briggs nor the dissent addresses this justification or offers a comparative analysis on this point. A review of the record, however, supports a finding that this was a non-race-based justification. As we previously noted, the prosecutor was explicit about her concern that Sam R. would not find the victims credible as witnesses. This exchange supports that reasoning. Nothing in the record shows that it was clearly pretextual.

As the sixth reason, the prosecutor cited Sam R.'s questionnaire answer of "yes" to the question whether he had a bias. No other seated juror answered "yes" to this question on the questionnaire. Thus, comparative analysis is of little value. The prosecutor, however, also cited the voir dire exchange on this question as further evidence of Sam R.'s evasiveness. When confronted with his questionnaire answer, he again replied with a question: "Do I have a bias? . . . I probably misunderstood your question." When pressed he answered "no," he did not have a bias. At a minimum, Sam R. was not forthcoming with his answers during voir dire. This factor further supports the appellate court's conclusion that substantial evidence supported the trial court's determination that Sam R.'s manner during voir dire was a non-race-based justification.

**[8]** Finally, the prosecutor cited several of Sam R.'s questionnaire answers and responses during voir dire for her perception that Sam R. was a "physical evidence" type of guy. The California Court of Appeal found that the record did not support this justification. The appellate court, however, also found that the prosecutor's main concern was Sam R.'s offhand demeanor, and the court concluded that the existence of

one weak justification did not prove purposeful discrimination or require reversal of the trial court's determination. *Rice*, 546 U.S. at 340-41 ("Concerned about the constitutionality of such a strike, the trial court made clear that it would not accept gender as a race-neutral explanation. . . . The prosecutor provided a number of other permissible and plausible race-neutral reasons, and Collins provides no argument why this portion of the colloquy demonstrates that a reasonable fact-finder must conclude the prosecutor lied about the eye rolling and struck Juror 16 based on her race."); *see also Cook*, 593 F.3d at 819 (concluding that the state court's determination that the peremptory strike was not substantially motivated by race was not objectively unreasonable even where "the prosecutor gave four legitimate and two illegitimate grounds for striking [the juror]. The prosecutor's two primary motivations are quite persuasive and are unrefuted by the record"). As the record does not refute the prosecutor's main concern with Sam R., the appellate court's conclusion that valid grounds— not race—motivated the strike was not objectively unreasonable.

### 4.   Cumulative Evidence

The prosecutor struck three African American jurors. There is no dispute that this fact calls for a searching inquiry. A close review of the record shows, though, that the state court was not objectively unreasonable in finding that the three jurors were excused for race-neutral reasons.

**[9]** When viewed as a whole, the record reveals that the prosecutor consistently questioned jurors in the same vein as her main concerns with the three African American jurors. For example, the record reveals that the prosecutor questioned almost every juror about whether he or she would require DNA to convict, especially when the individual had given anything short of a "no" answer on the questionnaire. This concern apparently stemmed from the prosecution's lack of DNA evidence. Similarly, she consistently questioned jurors

about the burden of proof in a rape case and whether each juror could convict on the word of one witness alone—a line of questioning linked to her anticipation that the victims would be the only testifying eye witnesses for the prosecution at trial. The consistency in her lines of questioning to jurors of all races and its relevance to the circumstances support crediting the prosecutor's fundamental concerns with Lawrence L., Georgia M., and Sam R. as potential jurors.

## III

**[10]** The trial court credited the prosecutor's justifications, and the California Court of Appeal found that substantial evidence supported the determination. Both the district court's and our own review of the record fail to show purposeful discrimination on the part of the prosecutor. Although some of the prosecutor's justifications may be weak when dissected and examined individually, the central justifications for each juror are sound and permissible. Under AEDPA's deferential standard of review, we cannot conclude that the California Court of Appeal's finding—that there was no racial discrimination—was objectively unreasonable.

**[11]** We therefore conclude that Briggs did not suffer any violation of his rights under the Fourteenth Amendment.

**AFFIRMED.**

---

BERZON, Circuit Judge, dissenting:

I respectfully dissent.

The California Court of Appeal accepted, with little examination, the prosecutor's proffered justifications for using peremptory challenges to strike three African-American pan-

elists, resulting in a jury without any black jurors.[1] While it purported to undertake a comparative juror analysis, it did so backwards. Rather than examining *each* of the reasons proffered by the prosecutor for striking African-American jurors to determine whether any, many, or most were pretextual, the appellate court sifted through the prosecutor's justifications, ignoring numerous pretextual rationales, in search of at least one reason that happened not to apply equally to a retained juror. Both Supreme Court precedent and our case law make clear that a court conducting comparative juror analysis must do the opposite—that is, it must examine each of the proffered justifications in turn. If any—or, worse, several—are equally applicable to seated jurors, an inference of pretext arises, rendering suspect the permissibility of the challenge. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 246, 250-52(2005); *Kesser v. Cambra*, 465 F.3d 351, 369 (9th Cir. 2006) (en banc).

Thus, while the California Court of Appeal "reviewed" the comparative juror analysis submitted by Briggs, its "review" was methodologically incorrect. It is no wonder that, according to the California Court of Appeal, its analysis was "largely beside the point." Comparative juror analysis will often be "beside the point" if conducted, erroneously, by casting aside all of the obviously pretextual rationales while foraging for one that is unique to the stricken juror.

It is unclear under our caselaw whether this flawed comparative analysis itself indicates that the state court decision "involved an unreasonable application of[ ] clearly established Federal law," 28 U.S.C. § 2254(d)(1), such that our review of Briggs' *Batson* challenge ought to be de novo. *Compare Cook v. LaMarque*, 593 F.3d 810, 816 n.2 (9th Cir. 2010) (holding that AEDPA deference applies "even if the trial court and the

---

[1]Out of a panel of sixty-five prospective jurors, there were four African-Americans. One was excused for cause. The prosecutor used peremptory challenges to strike the remaining three.

California Court of Appeal did not engage in comparative juror analysis" (internal quotation marks omitted)) *with Green v. Lamarque*, 532 F.3d 1028, 1030 (9th Cir. 2008) (holding that the trial court's "fail[ure] to undertake a sensitive inquiry into such circumstances and direct evidence of intent as may be available, *including a comparative analysis of similarly situated jurors*" contradicted "clearly established Supreme Court law" (internal quotation marks omitted) (emphasis added)). I shall therefore assume for purposes of this dissent that we must defer to the California Court of Appeal, despite its inaccurate legal analysis. Still, we must defer only to the extent that the California court's decision rested on a "[ ]reasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). It did not.

The prosecutor offered numerous justifications for striking each of the African-American jurors from the panel. Proper comparative analysis demonstrates, indisputably in my view, that the vast majority of these justifications with respect to the juror the majority calls Georgia M. were pretextual and thus indicative of a decision largely motivated by race. Absent a racial motivation, there would be no reason to make up a large number of pretextual reasons.

Under our caselaw, a peremptory challenge violates *Batson* if it is " 'motivated *in substantial part* by discriminatory intent,' " *Cook*, 593 F.3d at 815 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 484 (2008)) (emphasis added). With regard to Georgia M., this standard is clearly met.

The prosecutor offered several pretextual reasons for striking Georgia M., raising the inference that the strike was because of race. In addition to *six* demonstrably pretextual rationales, the prosecutor offered only two weak justifications that were not obviously false. These two justifications—themselves dubious—are insufficient to combat the inference raised by the numerous demonstrably pretextual rationales that the peremptory strike was motivated, *at least in substan-*

*tial part*, by race.[2] *Cf. Kesser*, 465 F.3d at 368 ("The stronger the objective evidence of discrimination, the more we will require by way of verifiable facts to sustain a trial court's finding upholding the exercise of challenges." (internal quotation marks omitted)). I would hold that the California Court of Appeals' contrary conclusion is unreasonable.

## I.

First, the California Court of Appeal relied—as does the majority—on Georgia M.'s statements ostensibly indicating that "she would require a higher burden of proof in a rape case" than in other kinds of cases. Not only is this characterization of Georgia M.'s statements on this point incomplete, as the majority acknowledges, but its credibility as a non-pretextual rationale is thoroughly undermined by comparative juror analysis.

As evidence that Georgia M. would not apply the correct standard of proof, the California Court of Appeal and the majority point to Georgia M.'s statements during voir dire

---

[2]In some instances, of course, a rationale not disproven through comparative analysis may have such inherent plausibility as to override any inference of pretext that arises from the failure of other proffered justifications to survive comparative analysis. For example, although many of the reasons the prosecutor gave for striking Juror Lawrence Lane ("Lawrence L.") were dubious, Lawrence L. did state that he "was in a sexual harassment case, and . . . didn't like the way it came out," and therefore it would be "difficult for" him not to hold the prosecutor to a higher standard than that required by law. This bald statement may have been a sufficiently strong basis for challenging Lawrence L. to dispel any inference of pretext derived from comparative juror analysis of the other justifications offered by the prosecutor for striking him. Still, that the prosecutor offered some dubious justifications for striking Lawrence L. provides further support for my conclusion that the challenge of Georgia M. was race-based. *See Kesser*, 465 F.3d at 369. Because this conclusion is sufficient to find a *Batson* violation, *see Snyder*, 552 U.S. at 478 , I assume here that the challenge of Lawrence L. was permissible and do not conduct a detailed analysis.

explaining reasonable doubt as "a slight doubt in your mind,"[3] and stating that the prosecutor's burden of proof ought to vary based on the severity of the crime at issue.

Georgia M.'s explanation of reasonable doubt as "slight doubt" occurred before the judge had explained the concept of reasonable doubt. The voir dire transcript demonstrates that Georgia M. was *not* stating that she would apply a different standard than "reasonable doubt," but rather that she was having difficulty explaining—without the benefit of a judge's instruction—the reasonable doubt standard.[4] This difficulty is not surprising, as the concept is notoriously elusive. "Although [the reasonable doubt] standard is an ancient and honored aspect of our criminal justice system, it defies easy explication." *Victor v. Nebraska*, 511 U.S. 1 (1994); *see also United States v. Nolasco*, 926 F.2d 869, 871-72 (9th Cir. 1991) (en banc) (highlighting "the difficulty of defining reasonable doubt"). The notion that the prosecutor would have stricken a juror because the juror had difficulty in defining, without any guidance, a legal concept widely regarded within the legal community as a difficult one is not plausible.

---

[3]The majority states that I characterize this rationale as "simply false." Not so. What is simply false is that the defense attorney "said to Miss McCutchen," as the prosecutor contended, that "it sounded as though . . . you were not going to follow the law at the end of the case . . . ." *See infra* at pages 6929-30. I do not think that the justification that Georgia M. equated reasonable doubt with "slight doubt" was false. Rather, as I explain, it is demonstrably pretextual.

[4]Georgia M.'s statement came in response to the defense attorney asking prospective jurors to explain reasonable doubt. Georgia M.'s full answer was:

I think I know what it means. It's when you—when a case or evidence or whatever, if there's a slight doubt that in your mind —okay. I'm trying to find the words for this—then there's a chance of reasonable doubt.

I don't know how to take it any further. I'm kind of tongue-tied right now.

During a somewhat confusing exchange with the prosecutor, Georgia M. did state that the burden of proof should be greater in a rape case, assenting to the proposition that the prosecutor would have to offer "just . . . a little bit more" evidence. However, the trial judge then interceded, informing Georgia M. that the standard of proof does not vary based on the crime. Georgia M. responded that she understood and could "follow that law."

It is perhaps plausible that, as the majority suggests, despite Georgia M.'s ultimate assurances to the contrary, this exchange could leave the prosecutor concerned about whether Georgia M. would require the prosecution to satisfy a higher burden of proof because the case involved rape. But comparative juror analysis reveals that even if the prosecutor harbored such a concern, it could not have been the rationale upon which she relied to strike Georgia M. Three seated jurors checked "yes" on their questionnaires in response to the question "Would you require more evidence in a sexual assault case as opposed to another type of crime such as auto theft?" One explained that such additional evidence would be required because sexual assault is "a more serious crime than auto theft." Another stated that more evidence is required because "a sexual assault case is a little more complex than a[n] auto theft case." Like Georgia M., upon being instructed that the amount of evidence required does not vary with the crime charged, these jurors retracted their statements.

The majority finds significant that it required more questioning to elicit a clear retraction from Georgia M. than from the seated jurors. But the record makes clear that such additional questioning occurred not because Georgia M. was intransigent, but rather because of the confused exchange between her and the prosecutor. Like the seated jurors, once the judge instructed Georgia M. as to the proper burden of proof and asked whether she could follow the law, she immediately and clearly affirmed that she could do so. There is thus

no relevant difference between Georgia M.'s answers on this point and those of the seated jurors.

The majority contends that the dismissal of prospective Juror Hernandez supports the conclusion that the burden of proof justification for dismissing Georgia M. was not pretextual. I disagree. First, the prosecutor gave no reason at all for dismissing Juror Hernandez, nor did she make any other statement that might indicate that the reason for Hernandez's dismissal was her statements regarding the burden of proof. In fact, it is exceedingly unlikely that such statements were the basis for the prosecutor's decision. Juror Hernandez's statements regarding the burden of proof were indistinguishable from those of the seated jurors cited by the majority. If anything, then, Juror Hernandez's dismissal indicates that similar statements could not have been a bona fide justification for dismissing a prospective juror.

Furthermore, there is a significant difference between Hernandez and Georgia M. that makes it impossible to draw a meaningful conclusion from comparing the two prospective jurors. Unlike Georgia M., Hernandez expressly stated that she was sympathetic to the defendant because of her work with juveniles as a deputy probation officer. Although Hernandez clarified that such sympathy would not impact her decisionmaking, it is much more likely that the prosecutor challenged Hernandez because of her expressed sympathy for the defendant than because of her statements about the burden of proof.

The prosecutor's other justifications fare no better. The prosecutor stated that the defense attorney "said to [Georgia M.], as well as [other prospective jurors] . . . it sounded as though when you were talking to the prosecutor, that you were not going to follow the law at the end of the case." This rationale is false. Defense counsel did indeed tell three prospective jurors that their voir dire testimony indicated that they would not follow the law. But Georgia M. was not one

of these jurors. The prosecutor was simply wrong on this point, again raising an inference of pretext. *See Miller-El*, 545 U.S. at 244; *Ali v. Hickman*, 584 F.3d 1174, 1190 (9th Cir. 2009).

The majority cites, as a non-pretextual reason for striking her, Georgia M.'s statement on her juror questionnaire that she "would hesitate to convict on the word of one witness alone." As a preliminary matter, the record is unclear on this point. Defense counsel's comparative analysis before the state court indicates that Georgia M. actually wrote not that she would be hesitant to "convict a defendant if she believed a victim's testimony beyond a reasonable doubt," but that she did not know whether she would be hesitant to do so.

However, even if her questionnaire did state, as the prosecutor claimed, that she would hesitate to convict based on the testimony of a single witness, Georgia M. clarified this statement during voir dire. When asked by the prosecutor if she could convict the defendant "based on the testimony of one person alone if [she] believed that testimony beyond a reasonable doubt," Georgia M. answered, "If I believed it, yes." The prosecutor did not excuse two Caucasian jurors whose questionnaires stated that they would hesitate to convict based on the victim's testimony alone, even if they believed such testimony beyond a reasonable doubt. Georgia M.'s written answer was thus, at worst, exactly the same as that of two seated jurors. Such a statement, followed by her affirmation during voir dire that she could, in fact, convict based on the victim's testimony alone, could not have been the reason she was excused.

The prosecutor further stated that she was concerned by Georgia M.'s ambivalence as indicated by an answer on her questionnaire stating that she had no opinion about whether sexual assault victims were more or less believable than victims of other crimes. The majority suggests that no other juror expressed similar uncertainty, but nearly all—ten out of

twelve—of the seated jurors gave substantially the same answer.[5] Therefore, this answer could not be a genuine reason for striking Georgia M.

The prosecutor also sought to justify her strike of Georgia M. by explaining that "when asked [in the juror questionnaire], do you think you'd require DNA, she said, depends how strong the other evidence is. So this is somebody who is clearly looking for, at least how I felt, stronger evidence than I would otherwise be required to present." The majority acknowledges that this rationale is "weak." I would hold that it is not just weak but clearly pretextual.

Three seated jurors gave substantially the same answer. Furthermore, two seated jurors gave answers that indicated far more strongly than Georgia M. did that they would be likely to require the presentation of DNA evidence. One answered "maybe not" to the question of whether she could convict without DNA evidence, explaining "I think it's necessary in proving the case." That juror noted that, particularly in rape or sexual assault cases, which this one was, she would require DNA evidence, going so far as to state that she would "maybe not" follow the law insofar as it does not require the presentation of DNA evidence. Another seated juror checked "no" when asked if he "could convict someone of rape or sexual assault without DNA evidence" and "yes" when asked if he "would require DNA evidence in a rape or sexual assault case." Thus, nearly half of the jurors who were seated gave the same answer regarding the need for DNA evidence or one that was worse for the prosecution than Georgia M. Her

---

[5]The majority's confusion likely stems from the phrasing of the question, which asked "Do you have any opinions that victims of sexual assault are more or less believable than those who report being the victim of other crimes?" Answering this question "No," as did the majority of seated jurors, meant that the juror was stating that he or she had no such opinion. This answer is precisely what the prosecutor asserted Georgia M. indicated on her questionnaire.

answer on this point is not, therefore, a credible justification for the peremptory challenge against her.

Nor is the prosecutor's statement that Georgia M. "said she was not a good judge of telling the truth." Preliminarily, defense counsel contradicted this characterization of Georgia M.'s statement. He stated that, in answer to the question of whether she is "a good judge of whether or not someone is telling the truth," Georgia M. wrote "no, not all the time." Because the federal appellate record does not contain the questionnaires of excused jurors, we cannot verify this characterization.

Either way, a comparison with seated jurors indicates that, even on the prosecutor's version, this statement is not a credible justification for striking Georgia M. One seated juror checked "No" and stated that she was "not really" a good judge of truth-telling. And several others who stated that they were generally good judges of truth-telling qualified their answers, adding that there were instances in which they had erred or that they were "not always" good at discerning whether someone was lying.

The majority, acknowledging that "[t]hese similar answers somewhat undermine the prosecutor's reasoning," states that nevertheless Georgia M.'s statement that she was not good at discerning whether someone was lying "could compound the prosecutor's concern that [she] would not be a good juror because she could be unduly influenced by her fellow jurors." I do not understand why this is so. There is, as far as I can tell, no relation between whether a juror is a good judge of truth-telling and the extent to which she is susceptible to the influence of her fellow jurors. To be sure, a prosecutor could permissibly decide to excuse jurors who stated that they were not good at determining whether someone was telling the truth. However, comparative juror analysis reveals that the prosecutor in this case did not do that. Therefore, the prosecutor's

assertion to the contrary in Georgia M.'s case is demonstrably pretextual.

The final justification cited by the majority is one upon which the California Court of Appeal explicitly declined to rely: the prosecutor's poor rapport with Georgia M. Unlike the vast majority of the prosecutor's proffered justifications for striking Georgia M., this rationale cannot be immediately discredited by comparative juror analysis—not because it is credible, but rather because it relies upon assertions that are impossible to evaluate from the record. The prosecutor stated that she "did not get a warm feeling from" Georgia M., that she "had no connection with her," and that Georgia M. was giving her "a cold stare with little eye contact."

Notably, this rationale is *not* equivalent to a justification based on a prospective juror's demeanor. It is, instead, a report on the prosecutor's own sense of her relationship with the juror. As such, this justification is essentially unfalsifiable. "Rapport" cannot be determined from a transcript. Indeed, with the exception, perhaps, of the extent and nature of Georgia M.'s eye contact, it would be difficult for even the trial judge to evaluate rapport, his presence during voir dire notwithstanding. In contrast to aspects of demeanor such as "nervousness" or "inattention" upon which prosecutors often rely, *Snyder*, 552 U.S. at 477, no judge could discern whether a prospective juror was giving a prosecutor a "warm feeling." *See United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir. 1989) (holding that a prosecutor's "feeling" about a juror was insufficient to overcome a prima facie case of discrimination in violation of *Batson*). Unsurprisingly, the trial judge here made no finding about the prosecutor's "rapport" with Georgia M.

Moreover, quite aside from its inherently opaque nature, I would view this justification with significant skepticism. Lack of "rapport" can be the manifestation of unconscious racial bias or cultural differences in communication. *See Batson v.*

*Kentucky*, 476 U.S. 79, 106-107 (1986) (Marshall, J., concurring.) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically."). And because we cannot evaluate its credibility, an explanation based on lack of rapport can easily serve to conceal a racial motive for a peremptory challenge.

In short, despite the plethora of justifications offered by the prosecutor for striking Georgia M., only two quite weak rationales remain even *possibly* plausible after careful examination: (1) Georgia M.'s explanation of "reasonable doubt" as "slight doubt"; and (2) her rapport with the prosecutor. Even if these rationales could, in some circumstances, serve as credible reasons for striking a juror—which I doubt—they are much too weak to dispel the inference that arises from the numerous other pretextual justifications that the prosecutor acted, at least in substantial part, based on race.

On this point, the caselaw is crystal clear: If, in addition to many pretextual rationales, a prosecutor manages also to come up with two reasons that survive comparative juror analysis, that circumstance ordinarily does not undermine the inference that the peremptory challenge was, at least in substantial part, racially motivated. *See, e.g.*, *McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir. 2000). If the prosecutor offers enough explanations, some of them are bound, simply by chance, not to apply to other jurors. As a result, the provision of multiple pretextual justifications suggests that the apparent validity of any facially plausible justification is illusory. Instead, where the other rationales are demonstrably pretextual, the inference arises that any other given justification "is also a make-weight." *Ali*, 584 F.3d at 1192.

In *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989), for example, we held that "the fact that two of the four proffered reasons" for striking Latino jurors in that case did

"not hold up under judicial scrutiny militates against [the] sufficiency" of the remaining two reasons, even if such reasons "would normally be adequately 'neutral' explanations." Here, *six* of the prosecutor's proffered reasons do not hold up. The other two are either exceedingly weak (Georgia M.'s explanation of reasonable doubt provided before the judge instructed jurors on its meaning) or unfalsifiable and inherently suspect (the "rapport" rationale). The only reasonable inference from this combination of explanations is that the prosecutor's justifications were, at least in substantial part, pretexts for race. *See Ali*, 584 F.3d at 1192 (" '[T]he prosecution's proffer of [one] pretextual explanation naturally gives rise to an inference of discriminatory intent,' even where other, potentially valid explanations are offered." (quoting *Snyder*, 552 U.S. at 485)). At best, the provision of numerous pretextual justifications and only two rationales that are even weakly plausible demonstrates a mixed motive—that is, it indicates the prosecutor was motivated at least in substantial part by race. I would therefore hold that the California Court of Appeal's contrary conclusion was an unreasonable determination of the facts before it.

## II.

Whether the Court of Appeal's determination that the prosecutor's challenge of Juror Sam Richardson ("Sam R.") was not race-based is also unreasonable is a closer question. Because "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose," *Snyder*, 552 U.S. at 478 (internal quotation marks, alteration, and citation omitted), and, in my view, the challenge of Georgia M. violated *Batson*, I need not address Sam R. I note, nevertheless, that while the prosecutor's contention that Sam R. was curt, flippant, and evasive does have some support in the record, other justifications offered by the prosecutor for striking him were either inaccurate, irrational, or belied by comparative juror analysis.

For example, the prosecutor stated that Richardson stated in his questionnaire that teenagers "are less believable because of age or personal background" when, in fact, he made no such statement.[6] Quite the opposite: Richardson stated that a "teenager can be *more* believable than an adult expectly [sic.] when a violent crime has be[en] committed against them." (emphasis added).

The prosecutor also stated that Sam R. "suggested that the physical evidence would be different" in a sexual assault case than in other kinds of cases, a conclusion the prosecutor explained, supported her "concern that this is a man, he's a physical evidence kind of guy, and that that's someone who also looks that the system sometimes makes the victim seem at fault." There are numerous problems with this justification. First, it is unsurprising that someone would comment that the physical evidence in a rape case would be different than that in, for example, an auto theft case—because, of course, it would be. It is difficult to understand why recognizing such a difference would make Sam R. a less fit juror.

Second, the prosecutor's ostensible concern that Sam R. was a "physical evidence kind of guy" is belied by comparative juror analysis. The prosecutor apparently had no objection to seating a juror who stated in her questionnaire that she could "maybe" convict a defendant "of rape or sexual assault without any DNA evidence" because "other physical evidence is also acceptable to consider."

Finally, there seems to be no logical connection between the prosecutor's conclusion that Sam R. was a "physical evidence kind of guy" and the inference she claimed to draw from that characterization, that Sam R. "looks that the system

---

[6]Because the questionnaires for non-seated jurors are not part of the federal appellate record, I am relying on defense counsel's representations in his memorandum before the trial court. These representations have not been contested by the state.

sometimes makes the victim seem at fault." It is difficult to discern what the prosecutor meant by this. To the extent that she meant that Sam R. viewed the system as sometimes unfairly blaming the victim, this would seem to bias him in the prosecution's favor and therefore not be a credible reason to strike him. *Cf. Ali*, 584 F.3d at 1184-86 (indicating that bias on behalf of the prosecution was not a plausible reason for a prosecutor to challenge a prospective juror). If, instead, the prosecutor was contending that Sam R. himself was inclined to blame the victim, the record suggests that he, in fact, held the opposite view. In his questionnaire, Sam R. stated, "Sometimes justice is not serv[ed]; the victim is not regarded by the outcome of the trial, the criminal . . . sometimes set free." Neither the prosecution's assertion that physical evidence was particularly important to Sam R. nor the inference she purported to draw from that fact are credible justifications for her peremptory challenge.

Regardless of whether the peremptory challenge of Sam R. violated *Batson*, the prosecutor's provision of pretextual justifications for this strike bolsters the conclusion that her actual reasons for striking African-American jurors "differed from those that [she] asserted and that [her] ulterior motive was race-based." *Ali*, 584 F.3d at 1196. "The prosecutor's willingness to make up nonracial reasons for striking [Sam R.] makes it even harder to believe that [her] reasons for striking [Georgia M.] were race-neutral." *Kesser*, 465 F.3d at 369.

## III.

Discarding otherwise valid convictions because jurors were ousted for racial reason is tough medicine. It is nonetheless necessary if we are to maintain a judicial system that is free of the taint of racial discrimination. There is a very real temptation for prosecutors to exercise peremptory challenges on the basis of race—and not, or at least not necessarily, because they are themselves racist. Rather, prosecutors may believe—rightly or wrongly—that race is as good (or bad) a predictor

of a juror's likely vote as other demographic factors such as age or education or any of the other arbitrary bases upon which prosecutors decide whether to excuse a juror. Still, our law proscribes the use of race, but not the use of these other factors, as a basis for prosecutorial hunches.

Maintaining peremptory challenges while at the same time proscribing one basis for exercising them comes at a price. That price is that we must be scrupulous, rather than sloppy, in assuring that race was not a substantial motivating factor for striking a juror.

Here, the trial court failed to examine thoroughly the prosecutor's proffered justifications for striking *every single* African-American prospective juror from the panel in a case in which an African-American defendant was charged with a cross-racial crime. Yet, despite this failure to conduct a proper inquiry, the California Court of Appeal deferred to the trial court's conclusion. Although the appellate court purported also to review the comparative juror analysis provided by Briggs, it did so in a perfunctory manner that missed the point of such analysis. This flawed analysis resulted in a decision that unreasonably concluded that the prosecutor did not rely on race in exercising her peremptory challenges. If, instead, we conduct the careful analysis of the prosecutor's proffered justifications that *Batson* and its progeny require, it becomes clear that, at least with respect to Juror Georgia M., the strike *was* motivated, at least in substantial part, by race. Our law simply does not permit prosecutors to exercise even discretionary challenges on this basis. I would therefore reverse.